JOHN H. CHASE *v.* SANDRA A. CHASE

\* \* \*

ROBERT BERNARD BOWMAN *v.* JEANETTE SALLEY

[No. 124, September Term, 1979.]

*Decided April 22, 1980.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Thomas J. Saunders, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellants.

*Kathleen M. Sweeney, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

ORDER. SMITH, J., filed a concurring opinion at page 473 *infra.* DAVIDSON, J., filed a concurring and dissenting opinion at 474 *infra.* ELDRIDGE, J., filed a dissenting opinion at page 474 *infra,* in which COLE, J., concurs.

## ORDER

The appellants having been found to be in civil contempt of court for failure to comply with child support orders and having appealed therefrom; and

The appellees having filed motions to dismiss the appeals on grounds of mootness under Maryland Rule 835 a 2 and 6; and

It appearing that the appellant Chase has heretofore purged himself of the contempt by serving 90 days in jail and now has been released from custody, thus rendering the matter moot, and that the appellant Bowman paid child support in an amount designated by the court sufficient to purge the contempt; it is, therefore, this 22nd day of April, 1980

ORDERED, by the Court of Appeals of Maryland, a majority of the Judges concurring, that the appeals be, and they are hereby, dismissed.

*Smith, J., concurring:*

I concur in the belief of the majority that once an individual has purged himself of his civil contempt that case is moot. In the cases at bar that is precisely what has taken place.

I point out that these cases are vastly different from those of *Attorney Gen. v. A. A. Co. School Bus,* 286 Md. 324, 407 A.2d 749 (1979), and *Bishop v. Governor,* 281 Md. 521, 380 A.2d 220 (1977), in which I dissented. I contended that the issues presented in those cases were recurring and thus should be addressed by us. In neither of those cases was there any practical way for us to correct the problem then before the Court other than by expressing ourselves in an opinion for the guidance of public officials and others concerned. Such is not the situation in these two matters. Under Maryland Constitution Art. IV, § 18 we are vested with administrative control over the courts of this State. Thus, in our administrative capacity we are in a position to take action to cope effectively with any problem which may exist in cases of this nature. In fact, it is our bounden duty to do so. We have moved to do just that. I believe such action is a much more potent curb of any abuses than is the rhetoric of an opinion addressed to a moot issue.

*Davidson, J., concurring and dissenting:*

I agree with the majority that these cases are moot. However, I agree with Judge Eldridge that they should be decided because there is urgency to establish a principle in a matter of important public concern which may frequently recur. I also agree with Judge Eldridge's conclusion on the merits for the reasons set forth in his dissenting opinion.

*Eldridge, J., dissenting:*

Because of the recurring pattern in both of these cases of the defendants' being found guilty of contempt for failing to make support payments, and the likelihood that the same pattern will continue in the future, I doubt that the cases are moot because the defendants happen to be out of jail at the present time. *Sheehy v. Thomas,* 155 Md. 688, 693, 142 A. 506 (1928). *See also Vitek v. Jones,* 445 U.S. 480, 100 S. Ct. 1254, 63 L. Ed. 2d 552, 48 U.S.L.W. 4317, 4319 (1980). Moreover, even if both cases are technically moot, they present the type of moot controversy which, under our opinions, a court should address. *Attorney Gen. v. A. A. Co. School Bus,* 286 Md. 324, 328, 333-334, 407 A.2d 749, 752,

755 (1979); *Reyes v. Prince George's County,* 281 Md. 279, 291-299, 380 A.2d 12 (1977).

## I.

The underlying facts in each of the cases are as follows.

### Chase v. Chase

On April 11, 1977, the Circuit Court for Montgomery County, in a divorce decree, ordered the petitioner John H. Chase to pay $75.00 per week for the support of his minor children. In October 1977, Chase's former wife, represented by the State's Attorney for Montgomery County, filed a petition to hold Chase in contempt, alleging that he had failed to make regular child support payments and was $390.02 in arrears. After a hearing on November 29, 1977, the circuit court on December 12, 1977, adjudged Chase in contempt, found that he was in arrears in the amount of $2,003.62 plus court costs, and "ordered that the Defendant shall serve sixty days in the Montgomery County Detention Center, the execution of said sentence to be stayed until December 16, 1977." The order further directed Chase to pay $200.00 of the arrearage by December 15, 1977, and, commencing December 16, to pay $75.00 per week child support plus $5.00 per week on the arrearage until it was paid in full. This order had no language suspending the execution of the sentence or expressly providing for Chase to purge himself, although perhaps it might be inferred that the payment of $200.00 would keep him out of jail. The record before us contains no transcript of the November 29, 1977, hearing, and does not indicate whether Chase was represented by counsel.

Subsequent petitions to hold Chase in contempt were filed by the State's Attorney for Montgomery County, representing Chase's former wife, on February 10, 1978, May 4, 1978, and July 28, 1978. Chase was not served with the February petition, and he did not appear in response to the show cause order issued on the May petition, later

claiming that he did not receive the petition or order. The July 28, 1978, petition commenced the instant contempt proceedings.

There were three circuit court hearings following the July 28 contempt petition, held on October 3, 1978, on December 1, 1978, and on June 18, 1979. At the October and December 1978 hearings Chase was represented by counsel, although no testimony was taken at either of these hearings. His attorney, at the October hearing, merely asked that the matter be continued until December 1, to "afford myself an opportunity to meet with my client and prepare for a hearing on the merits," and the attorney represented that Chase would pay $75.00 per week during the period of the continuance. The court granted the postponement and ordered Chase to pay $75.00 per week in the interim.

At the December 1, 1978, hearing, the Assistant State's Attorney representing Chase's former wife stated that the arrearage had reached $5,453.62 and that "we have agreed" that Chase be adjudged in contempt and sentenced to 90 days in jail, with the sentence to be suspended as long as he continued to pay $50.00 per week current child support, $15.00 per week on the arrearage, and $1.50 per week toward the court costs due, for a total of $66.50 weekly. There was no exploration at this hearing of Chase's ability to pay, although his attorney made reference to the sporadic nature of Chase's work in the construction trades and his having filed applications for new jobs which would provide " a more stable type of income over the year long period." The court accepted the stipulation and warned Chase not to fail to make the $66.50 payment every week or he would spend "at least the ninety days in jail."

The next hearing in the case, and the hearing leading to the order from which this appeal was taken, occurred on June 18, 1979. Mr. Chase was not represented by counsel at this hearing, although his former wife continued to be represented by the State's Attorney's office. Furthermore, no inquiry was made concerning his lack of counsel, and he was not advised that he had any right to representation by

counsel. The hearing began by the court asking Chase why he had made no payments after the order of December 1, 1978. Chase stated that, in 1978 (apparently after the December 1st hearing), he was involved in an accident and his foot was cut off. As a result, he was unemployed until "about two months ago," and "[t]he reason I didn't start making the payments yet, I was just getting myself back together." The circuit judge then reviewed the history of the judicial proceedings, pointed out that the original order was on April 11, 1977, and asked Chase why he had not made more support payments at an earlier stage. The defendant replied that he was in jail for six months in 1977. The Assistant State's Attorney asked about Chase's present employment, and Chase replied that he was working for a landscaping firm in Gaithersburg, Maryland. Thereupon the circuit court concluded the hearing as follows:

"THE COURT: All right.

"The Court affixes the arrearages as of June 8th in the amount of $6,228.62, and that is the total of arrearages, and it includes any amount entered by Judge Frosh on 12/1/78.

"So the record is clear, that is the total amount as of June 8th, including all prior, $6,228.62.

"The condition of the suspension of contempt was he make payments in the amount of $50.00 per week. No payments have been received.

"Accordingly, the original sentence of ninety days in the Montgomery County Detention Center is hereby imposed.

"He is remanded to custody of the Sheriff for execution of that sentence.

"He may purge himself of that contempt by the payment, under the condition of Judge Frosh's order, which at that time was, it appears to be $4,789.00, and it is now $6,228.00.

"He may purge himself of the contempt by

payment of $1,500.00, and thereafter making payments as ordered."

Afterwards, an Assistant Public Defender entered an appearance as Chase's attorney and filed an order of appeal to the Court of Special Appeals.

### Bowman v. Salley

The Circuit Court No. 2 of Baltimore City, in a paternity decree filed on November 15, 1967, ordered the defendant Robert Bernard Bowman to pay $5.00 per week support for his son, Bernard Bowman, born in 1961. On the same day, by another paternity decree, the court ordered the defendant to pay $5.00 weekly support for his son, Joseph Donthan Bowman, born in 1966. The respondent in this present action, Jeanette Salley, was the mother of both children. The record before us contains eight contempt petitions in both cases from 1968 until the present, charging the defendant with failure to make the support payments, although the incomplete nature of the record makes it difficult to determine what occurred following each petition.

On June 7, 1979, the defendant Bowman was brought before what is known as Part 8 of the Criminal Court of Baltimore on two charges of contempt of court and one of criminal nonsupport. The two contempt cases were based upon his failure to make payments for the support of his children, Bernard Bowman and Joseph Donthan Bowman. An appearance on behalf of the plaintiff-mother in these cases, Jeanette Salley, was entered by an agent of the Division of Parole and Probation. The criminal nonsupport case was based upon the defendant's alleged failure to make support payments of $20.00 per week for his wife, Margaret Bowman, and their three children, plus $10.00 per week upon the arrearage. These payments were required by a court order of April 11, 1968. The criminal nonsupport case was also being prosecuted by the same agent of the Division of Parole and Probation.

At the hearing on the three cases, Mr. Bowman was not represented by counsel, did not waive counsel, and was not

advised concerning any right to have counsel. The hearing commenced by the court entering "not guilty" pleas in the three cases and swearing Mr. Bowman and the Parole and Probation agent as witnesses. The agent then testified that, with regard to the support orders in the two paternity decrees, Mr. Bowman's last payment was in 1974 and the total arrearages in the two cases amount to $5,715.00. The arrearage in the criminal nonsupport case was, according to the agent, $4,532.00.

After the agent's testimony concerning the amount of money owed, the following took place:

"THE COURT: You owe $9,000 in arrears on three court orders. You want to tell me anything, sir?

"MR. BOWMAN: Your Honor, like I haven't worked, sometime I work and sometime I couldn't work. I have asthma and now I have black outs when I been drinking. But, you know, asthma, sometimes I work a week, two weeks.

"THE COURT: What kind of work do you do?

"MR. BOWMAN: What?

"THE COURT: What kind of work do you do?

"MR. BOWMAN: Well I was doing a little, well, carpenter helper, digging holes, whatever.

"THE COURT: How do you live; how do you support yourself?

"MR. BOWMAN: It has been hard, but I made it. I been living basically with friends now and with my father sitting back here and then like, just up to about a few months ago I went after it got, they got things, got high like they are, high, to get on Social Service because daggone I wasn't able to, daggone, to do like I been doing anymore because they aren't like, I mean, things are just daggone hard.

"THE COURT: How old are you, sir?

"MR. BOWMAN: What?

"THE COURT: How old are you, sir?

"MR. BOWMAN: I'm forty-three.

"THE COURT: Where do you live, you live with your parents?

"MR. BOWMAN: No, I live at 517 Paca Street.

"THE COURT: Who do you live with?

"MR. BOWMAN: Frank Hall.

"THE COURT: Who is Frank Hall, a friend?

"MR. BOWMAN: Yes, sir, a friend of mine.

"THE COURT: How long have you been living there?

"MR. BOWMAN: About, I guess about a year now.

"THE COURT: Well, how do you live? How do you feed yourself and buy clothes and things like that?

"MR. BOWMAN: I ain't been buying what you call no clothes.

"THE COURT: How do you eat, where do you get food from?

"MR. BOWMAN: I go to my grandmother, different places, you know, I haven't been, I mean I been eating here and staying with friends, that is how I been doing it.

"THE COURT: I see.

"MR. BOWMAN: There is my father right there, he will tell you.

"THE COURT: Where is your father?

"MR. BOWMAN: Sitting right there.

"A SPECTATOR: Here.

"THE COURT: All right.

"MR. BOWMAN: I just been doing.

"THE COURT: Okay. In the two —

"MR. BOWMAN: Just daggone it. I got Social Aid myself.

"THE COURT: All right, in the two contempt of court cases, the court finds you guilty of contempt of court.

"Sentence of the court is three years, Department of Correction, each case to be served consecutively.

"In the non-support case, the court quashed that warrant in view of the conviction in the other case.

"Mr. Sheriff?

"MR. BOWMAN: What I got to do, three years?

"THE COURT: Six years.

"MR. BOWMAN: Six years?

"THE COURT: He needs $1,000 in each case.

(CONCLUSION OF PROCEEDINGS)"

On the same day as the hearing, a written order was filed, on a form of the Circuit Court No. 2 of Baltimore City, committing Bowman to the jurisdiction of the Commissioner of Correction for a total of six years, with his release conditioned upon the payment of $2,000.00.[1] Thereafter, an Assistant Public Defender was assigned by the Office of Public Defender to represent Mr. Bowman, and a timely order of appeal was filed.

Bowman served seven months of his sentence, and then the trial judge offered him the right to purge with a reduced payment of $700.00. Recently he made this payment from money earned while he was incarcerated, and he was then released from imprisonment.

### Proceedings In This Court

Before the *Chase* and *Bowman* cases were heard by the Court of Special Appeals, the Public Defender's Office filed in this Court a single petition for a writ of certiorari encompassing both cases. The petition challenged the

---

1. As previously mentioned, the two civil contempt proceedings and the criminal nonsupport proceeding were tried together in what is known as Part 8 of the Criminal Court of Baltimore, and the court reporter's certificate refers to the entire proceedings as having taken place in the Criminal Court of Baltimore. However, the Criminal Court of Baltimore would have had no jurisdiction over the two *civil* cases, and any order of the Criminal Court of Baltimore in a civil case would be a nullity. Gatewood v. State, 264 Md. 301, 285 A.2d 623 (1972). It is undoubtedly for this reason that the commitment order was on a form of the Circuit Court No. 2.

"perfunctory procedures" in these cases and the absence of any finding, or evidence supporting a finding, that either defendant was able to pay and purge himself. It was also claimed in the petition that each defendant was deprived of his right to counsel.

In opposing certiorari, the Attorney General's Office, representing Sandra A. Chase and Jeannette Salley, pointed out that Mr. Chase had already served his 90 day sentence and argued that his appeal was moot.[2] Nevertheless, because of the importance of the issues presented, this Court granted the certiorari petition with regard to both petitioners. Now, after briefing and oral argument in this Court, the majority has decided to dismiss both appeals because the defendants are not now incarcerated.

## II.

Where certain conduct or a particular state of facts forms the basis for seeking judicial action, the mere cessation of that conduct or a change in the state of facts does not require the dismissal of the judicial proceedings on grounds of mootness where the matter is a continuing controversy or the circumstances are likely to recur. *Sheehy v. Thomas, supra,* 155 Md. at 693 (matter likely to be recurring). *See also, e.g., Gray v. Sanders,* 372 U.S. 368, 375-376, 83 S. Ct. 801, 806, 9 L. Ed. 2d 821 (1963); *United States v. W. T. Grant Co.,* 345 U.S. 629, 632-633, 73 S. Ct. 894, 897-898, 97 L. Ed. 1303 (1953). *Cf. Carpenters v. Roofers,* 181 Md. 280, 282, 29 A.2d 839 (1943) (where "it clearly appears to the court that there will *not* be a continuance . . . [of the conditions giving rise to the request for judicial relief,] the question has become moot") (emphasis added). Just a few weeks ago in *Vitek v. Jones, supra,* involving an attack upon respondent's involuntary commitment to a mental institution, the United States Supreme Court recognized and applied this principle. The Court there held that the case was not moot on the ground that respondent was no longer confined in the

2. At that time, Mr. Bowman had not yet been released from prison.

mental institution because there was some expectation that he would be so confined in the future.

This principle would appear to be fully applicable in the present case. The records in these cases disclose a recurring pattern of the defendants' failure to make support payments and of contempt petitions being filed against them. In light of this past experience, the defendants' employment capabilities, and their health problems, it is most probable that there will be future contempt hearings in both cases. The questions presented concerning the nature of those hearings are likely to recur with respect to each defendant. For these reasons, I do not believe that these cases should be regarded as moot.

Even if these two cases are moot, they present the type of issues which, under our opinions, we should now decide. Recently in *Reyes v. Prince George's County, supra,* 281 Md. at 291-299, this Court in an opinion by Judge Digges extensively reviewed the mootness doctrine and concluded that we were not prevented by constitutional limitations or rule provisions from deciding issues presented in cases which have become moot. It was pointed out that this Court has in the past "occasionally found it prudent to render decisions in cases moot as to the parties where the appropriate circumstances appear" (*id.* at 299). The Court suggested that "appropriate circumstances" are present when the issues are recurring and of public importance (*id.* at 291-292 n. 9, 299). More recently, in *Attorney Gen. v. A. A. Co. School Bus, supra,* 286 Md. at 328, 333-334, both the majority and dissenting opinions reiterated that we may decide a moot question when there is urgency to establish a principle in a matter of important public concern which may frequently recur.

The issues presented relate to whether a person can properly be imprisoned for civil contempt by proceedings such as those which occurred in these cases. The two principal questions are: (1) whether a defendant failing to make court ordered support payments can properly be incarcerated for civil contempt when his own testimony presents a prima facie case of inability to pay, and there is

no contrary evidence; and (2) whether such a defendant may properly be sentenced to a lengthy prison term without representation by counsel, where there is no waiver of counsel and not even any advice concerning entitlement to counsel. In light of the great number of civil contempt proceedings based upon the failure to make support payments, the well-known problems associated with the enforcement of support orders, and the fundamental nature of the individual rights involved, these are obviously extremely important issues which need to be dealt with by this Court. Furthermore, assuming that the instant cases should be considered moot because the issues are not likely to recur with regard to these defendants,[3] nevertheless the issues themselves are recurring ones in this State. At the oral argument before us, counsel pointed out that the type of proceedings here, with the same defects, frequently occur in other cases. Some of the members of this Court have actual knowledge that this representation is accurate.[4] Consequently, even if the *Chase* and *Bowman* cases are regarded as moot, the issues raised should now be resolved by this Court under the principles set forth in *Attorney Gen. v. A. A. Co. School Bus, supra,* and *Reyes v. Prince George's County, supra.*

### III.

Turning to the merits, it is clear that the defendants Chase and Bowman were improperly tried and sentenced to imprisonment.

In *Johnson v. Johnson,* 241 Md. 416, 216 A.2d 914 (1966), a father, under a court order to pay $50.00 per week child support, was imprisoned until he purged himself of contempt for failure to pay the accumulated arrearages. At the hearing, the father had offered to testify concerning his earning capacity and his general ability to pay, but the trial

---

3. Such assumption is, as previously pointed out, contrary to the facts shown by these records.

4. This Court can take judicial notice of such practices occurring in the courts of this State. *See* Davidson v. Miller, 276 Md. 54, 67, 81, 344 A.2d 422 (1975).

court did not take testimony. On appeal, this Court decided that the incarceration was improper and remanded for a new hearing, holding that the court must give the defendant an opportunity to show inability to pay, and that if such a showing is made, the defendant may not be incarcerated. Judge Horney there stated for the Court (241 Md. at 420):

> "Until he was given an opportunity to show that he had neither the estate nor the ability to pay his obligation and failed to make such a showing, he should not have been incarcerated. The purpose of imprisonment for contempt is to compel compliance with a court order but where the person alleged to be in contempt can establish a valid defense, such as the unintentional inability to obey the order, imprisonment is not proper."

*See also Speckler v. Speckler,* 256 Md. 635, 637, 261 A.2d 466 (1970). Neither the *Chase* nor the *Bowman* proceedings comport with the holdings in *Johnson v. Johnson, supra.*

In *Chase,* the defendant was incarcerated without any hearing, in a realistic sense, where he had an opportunity to show an inability to pay. The "hearing" leading to Chase's imprisonment was on June 18, 1979. The record discloses that the trial judge, at this hearing, did not even have Mr. Chase sworn as a witness. The hearing commenced by the court asking the unrepresented defendant certain questions concerning his failure to pay. Every one of Chase's answers suggested an inability to pay. He stated that he had an accident just after the prior court order, that he lost a foot, and that he was not able to obtain employment until just two months previously. After listening to these uncontradicted statements, and without exploring the matter further, the trial judge sentenced Chase to jail. This was certainly not the type of hearing contemplated by the *Johnson* case.

The hearing and sentence in *Bowman* were obviously inconsistent with this Court's holdings in *Johnson.* Mr. Bowman's answers to the court's questions presented a detailed prima facie case of inability to pay. He began by saying that he had not been working, that his employment

was sporadic and that sometimes he could not work. Bowman stated that he suffered from asthma and "black outs" resulting from drinking. In reply to the question of how he lives and supports himself, Bowman testified that he lives with friends and his father. When asked how he feeds himself and buys clothes, Bowman testified that he obtains food from his grandmother and friends and that he has not been buying any clothes. The unrepresented Bowman then attempted to offer his father as a witness, saying "he will tell you." However, after ascertaining that the defendant's father was present, the trial court was apparently uninterested in hearing from the witness, and began to render judgment in the two cases. Bowman interrupted by stating, "I got Social Aid myself," and the trial court went on: "All right, in the two contempt of court cases, the court finds you guilty of contempt of court. Sentence of the court is three years, Department of Correction, each case to be served consecutively."

If the trial court in the *Bowman* case had any doubts concerning the sufficiency of the defendant's testimony to establish inability to pay, he should have heard the offered testimony of the defendant's father. The refusal to hear this testimony cannot be squared with the *Johnson* holding that a defendant in this type of case must be given an opportunity to present evidence of an inability to make the support payments. The more egregious error in the *Bowman* hearing, however, was the trial court's sentencing the defendant to six years' imprisonment after his uncontradicted testimony clearly established a prima facie case of inability to pay. If, as we are advised, proceedings like this are occurring with some frequency in the "Circuit Court No. 2" of Baltimore City, in flagrant violation of the law set forth in *Johnson v. Johnson, supra,* this Court should deal with it in these cases instead of dismissing them as "moot."

The other major question presented involves the right to counsel in proceedings such as this.

The Supreme Court, in *In re Gault,* 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967), held that the constitutional right to the assistance of counsel is applicable to juvenile

delinquency proceedings, despite the fact that they are categorized as "civil" proceedings, because the determination is one "carrying with it the awesome prospect of incarceration in a state institution" (387 U.S. at 36-37).

Five years after *Gault,* in *Argersinger v. Hamlin,* 407 U.S. 25, 92 S. Ct. 2006, 32 L. Ed. 2d 530 (1972), the Court held "that absent a knowing and intelligent waiver, no person may be imprisoned for any offense, whether classified as petty, misdemeanor, or felony, unless he was represented by counsel at his trial." (407 U.S. at 37.) Although *Argersinger* involved a criminal offense for which the defendant was sentenced to 90 days in jail, the Supreme Court's opinion in that case suggested that the critical factor governing the right to counsel was incarceration and not the state law categorization of the matter (407 U.S. at 38):

> "We do not sit as an ombudsman to direct state courts how to manage their affairs but only to make clear the federal constitutional requirement. How crimes should be classified is largely a state matter. The fact that traffic charges technically fall within the category of 'criminal prosecutions' does not necessarily mean that many of them will be brought into the class where imprisonment actually occurs."

And (*id.* at 40):

> "The run of misdemeanors will not be affected by today's ruling. But in those that end up in the actual deprivation of a person's liberty, the accused will receive the benefit of 'the guiding hand of counsel' so necessary when one's liberty is in jeopardy."

Just last year, in *Scott v. Illinois,* 440 U.S. 367, 99 S. Ct. 1158, 59 L. Ed. 2d 383 (1979), the Court reiterated that the critical factor governing the constitutional right to appointed counsel is whether there is actual incarceration. In that case the petitioner, an indigent unrepresented by counsel, had been convicted of shoplifting and fined $50.00.

Although under Illinois law he could have received a jail term, only the small fine was imposed. The Supreme Court affirmed the conviction, holding that there was no deprivation of the right to state-furnished counsel where no term of imprisonment was imposed. The Court, in an opinion by Mr. Justice Rehnquist, stated with regard to *Argersinger* (99 S. Ct. at 1162):

> "[W]e believe that the central premise of *Argersinger* — that actual imprisonment is a penalty different in kind from fines or the mere threat of imprisonment — is eminently sound and warrants adoption of actual imprisonment as the line defining the constitutional right to appointment of counsel."

As pointed out above, *Argersinger* involved a matter labelled as "criminal." Nevertheless, since the time of that decision, the federal and state appellate courts, relying upon the reasoning of *Argersinger,* have generally held that due process requires the appointment of counsel for indigents in *civil* contempt proceedings if they are sentenced to imprisonment. *United States v. Anderson,* 553 F.2d 1154 (8th Cir. 1977); *In re Di Bella,* 518 F.2d 955, 959 (2d Cir. 1975); *In re Kilgo,* 484 F.2d 1215, 1221 (4th Cir. 1973); *Henkel v. Bradshaw,* 483 F.2d 1386, 1389 (9th Cir. 1973); *United States v. Sun Kung Kang,* 468 F.2d 1368 (9th Cir. 1972); *Otton v. Zaborac,* 525 P.2d 537 (Alaska 1974); *People v. Lucero,* 584 P.2d 1208, 1214 (Colorado 1978); *Commonwealth Ex Rel. Brown v. Hendrick,* 220 Pa. Super. 225, 283 A.2d 722 (1971); *Tetro v. Tetro,* 86 Wash. 2d 252, 544 P.2d 17, 19 (1975). *Cf. Duval v. Duval,* 114 N.H. 422, 322 A.2d 1, 4 (1974) (holding, in reliance on *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973), that whether due process requires the appointment of counsel in civil contempt proceedings depends "on circumstances which show that the defendant would be treated unfairly if the assistance of counsel were not provided"); *Sword v. Sword,* 399 Mich. 367, 249 N.W.2d 88 (1976) (apparently taking the same view as the court in *Duval).*

The rationale of the above-cited cases is, in my view, entirely sound. As the United States Court of Appeals for the Eighth Circuit pointed out: "Deprivation of liberty has the same effect on the confined person regardless of whether the proceeding is civil or criminal in nature." *United States v. Anderson, supra,* 553 F.2d at 1156. The Supreme Court of Colorado recently made the same observation: "Labeling the contempt civil . . . does not alter the burden of imprisonment." *People v. Lucero, supra,* 584 P.2d at 1214. And in reversing a thirty-day jail sentence for civil contempt based upon failure to make court-ordered support payments, the Supreme Court of Washington stated (*Tetro v. Tetro, supra,* 544 P.2d at 19-20):

> "But insofar as the right to counsel is concerned, the label put on proceedings is less important than the threat of imprisonment they entail. It was this threat that the court in *Argersinger v. Hamlin, supra,* held was determinative of the existence of the right to counsel in criminal cases. . . .
>
> "Whatever due process requires when other types of deprivation of liberty are potentially involved, when a judicial proceeding may result in the defendant being physically incarcerated, counsel is required regardless of whether the trial is otherwise 'criminal' in nature. The grim reality of a threatened jail sentence overshadows the technical distinctions between 'criminal,' 'quasi-criminal,' and 'civil' violations and demands that the protection of legal advice and advocacy be given all persons faced with it. We thus join the great majority of courts which have addressed the issue and hold that, wherever a contempt adjudication may result in incarceration, the person accused of contempt must be provided with state-paid counsel if he or she is unable to afford private representation. . . ." [5]

---

5. In *Tetro,* the court went on to note a qualification to its holding (544 P.2d at 20 n. 1):

"The threat of imprisonment upon which we hold the right to

In sum, the sentencing of the defendant Chase to 90 days in jail, and the sentencing of the defendant Bowman to six years' imprisonment, without representation by counsel and absent a knowing and intelligent waiver of the right to counsel, violated their constitutional rights.[6]

The two principal issues discussed above, as well as other questions presented by these cases concerning the manner in which civil contempt proceedings for nonsupport are being handled in this State,[7] deserve the attention of this Court. I respectfully dissent from the order dismissing the appeals on grounds of mootness.

Judge Cole has authorized me to state that he concurs with the views expressed herein.

---

counsel turns must be immediate. The mere possibility that an order in a hearing may later serve as the predicate for a contempt adjudication is not enough to entitle an indigent party therein to free legal assistance. Thus the state need not furnish counsel to defendants in child support suits which may subsequently result in orders the violation of which would be contemptuous."

6. Additionally, the Public Defender Act would appear to have granted the defendants a statutory right to counsel. Maryland Code (1957, 1976 Repl. Vol., 1979 Cum. Supp.), Art. 27A, § 4 (b) provides:

"(b) Legal representation shall be provided indigent defendants in the following proceedings:

(1) In any criminal or juvenile proceeding constitutionally requiring the presence of counsel prior to presentment before a commissioner or judge.

(2) Criminal or juvenile proceedings, where the defendant is charged with a serious crime, before the District Court of Maryland, the Supreme Bench of Baltimore City, the various circuit courts within the State of Maryland, and the Court of Special Appeals.

(3) Postconviction proceedings under Article 27, Annotated Code of Maryland.

(4) Any other proceeding where possible incarceration pursuant to a judicial commitment of individuals in institutions of a public or private nature may result."

Subsection (4) literally seems to apply to civil contempt proceedings.

7. For example, the order in *Bowman,* insofar as it commits the defendant to the custody of the State Commissioner of Correction for civil contempt, instead of to the Baltimore City Jail, is questionable.