*State of Maryland v. Neiswanger Management Services, LLC et al.*, No. 28, September Term, 2017, Opinion by Adkins, J.

**HEALTH — INJUNCTIVE RELIEF — EFFECT OF STATUTORY AUTHORIZATION:** Md. Code (1982, 2015 Repl. Vol.), § 19-345.3(c) of the Health–General Article ("HG") permits the Attorney General to seek, and a circuit court to grant, broad injunctive relief on behalf of multiple unnamed residents of nursing facilities for violations of HG §§ 19-345, 19-345.1, or 19-345.2, which address involuntary discharges and transfers of residents from nursing facilities.

**HEALTH — INJUNCTIVE RELIEF — AUTHORITY TO ENFORCE:** HG § 19-344(c)(5)(ii) requires nursing facilities to cooperate with and assist residents' agents in seeking assistance from the medical assistance program. HG § 19-344(c)(6)(ii), which directs the Attorney General to enforce and prosecute violations of HG § 19-344(c)(4)–(5), impliedly authorizes the Attorney General to seek injunctive relief to enforce a nursing facility's statutory obligations.

Circuit Court for Montgomery County
Case No.: 428607V
Argued: December 5, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 28

September Term, 2017

STATE OF MARYLAND

v.

NEISWANGER MANAGEMENT
SERVICES, LLC et al.

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

Opinion by Adkins, J.

Filed: February 20, 2018

Statutory interpretation is a complex task for any court, and requires careful reflection upon the text of the statute, and the intent of the legislative body. These complexities are compounded when we consider a statute's relationship with equitable doctrines. The Maryland General Assembly has enacted a comprehensive scheme to identify and protect the rights of individuals in nursing facilities in Maryland called the Patient's Bill of Rights. Md. Code (1982, 2015 Repl. Vol.), §§ 19-343 *et seq*. of the Health–General ("HG") Article. In this case, we are asked to decide whether the Attorney General has authority to request injunctive relief against a nursing facility pursuant to two different provisions of the Patient's Bill of Rights.

### FACTS AND LEGAL PROCEEDINGS

Neiswanger Management Services, LLC ("Neiswanger") operates four Maryland nursing facilities[1] located in Anne Arundel County ("New Annapolis"), Montgomery County ("NMS Silver Spring" and "NMS Springbrook"), and Prince George's County ("NMS Hyattsville").[2] On December 21, 2016, the State of Maryland, through the Attorney General, filed a two-count Complaint in the Circuit Court for Montgomery County against Neiswanger and other related corporate and individual defendants. The

---

[1] Md. Code (1982, 2015 Repl. Vol.), § 19-343(a) of the Health–General Article defines a "facility" as "a related institution that, under the rules and regulations of the Department [of Health], is a comprehensive care facility or an extended care facility." *See* COMAR 10.07.09.02.B(6) (defining comprehensive care facility); COMAR 10.07.09.02.B(13) (defining extended care facility). We use the term "nursing facility" for convenience.

[2] Neiswanger formerly operated a facility in Washington County ("NMS Hagerstown"), which closed in 2017.

Complaint alleged violations of the Patient's Bill of Rights, and the Maryland False Health Claims Act, HG §§ 2-601, *et seq.* Count One, the subject of this appeal, related to allegedly unlawful resident discharges from Neiswanger facilities in violation of HG §§ 19-345, 19-345.1, and 19-345.2, as well as multiple provisions of COMAR.[3]

The State alleged that Neiswanger engages in a widespread pattern of unlawful involuntary discharges of residents from their nursing facilities. These practices include involuntary discharges to homeless shelters or "sham assisted living facilities" with operators who unlawfully exploit residents' public benefits. Neiswanger discharged residents to shelters or facilities far from residents' hometowns and families. Many evicted residents are ultimately hospitalized, at the State's expense, with serious or life-threatening medical complications caused by the evictions.

To support its claims about the breadth of Neiswanger's alleged misconduct, the State asserted that during a 17-month period, from January 1, 2015 to May 31, 2016, Neiswanger issued involuntary discharge notices to at least 1,061 residents. In 1,038 of these discharge notices, Neiswanger stated that the resident was discharged for failure to pay, or for failure to arrange for payment from Medicare,[4] Medicaid,[5] or another third-

---

[3] The State alleged violations of: COMAR 10.09.10.03(Q); 10.07.09.04(A)(7); 10.07.09.09(C) and (F)(4); 10.07.09.10(A)(4), (C) and (D)(8); 10.07.09.11(A)(1)(a)–(c), (B), and (C)(2).

[4] Medicare is "a health insurance program which provides for payment for medical care to persons over 65 years of age." *Fort Washington Care Ctr. Ltd. P'ship v. Dep't of Health & Mental Hygiene*, 80 Md. App. 205, 211 n.3 (1989).

[5] The Maryland Medical Assistant Program or "Medicaid" is a "a State program partially funded by the federal government, which reimburses nursing homes for their

party payor.  By contrast, the State observed that during the same 17-month period, all of Maryland's other 225 licensed nursing facilities issued approximately 510 involuntary discharge notices.  It claimed that "more than 700 people" who "reside in the five NMS facilities," could be affected by Neiswanger's unlawful discharge practices.

The State provided detailed factual narratives of eight Neiswanger residents' discharges between October 2015 and August 2016.  These residents were improperly discharged to family members' homes, homeless shelters, or predatory unlicensed assisted living facilities in violation of the Patient's Bill of Rights.  One resident was left outside a family member's home on a hot day.  Residents were sent to unfamiliar locations.  In many cases, Neiswanger failed to communicate with residents and their family members regarding discharge plans.  Three of the named residents had been evicted from Neiswanger facilities on multiple occasions over a period of several years.

The State asserted that Neiswanger unlawfully discharges residents to benefit from the public-insurance payment system for residents of nursing facilities in Maryland.  Medicare recipients are entitled to up to 100 days' coverage in a nursing facility after a qualifying hospital stay.  For the first 20 days of a resident's stay, Medicare pays the full reimbursement rate, and an 80% reimbursement rate for days 21 to 100.  Some residents may be "dual eligibles," who participate in both Medicare and Medicaid.  When a resident has exhausted their Medicare coverage, and is eligible for Medicaid, then the

_____

patient related costs of medical care rendered to indigent or medically indigent persons." *Liberty Nursing Ctr., Inc. v. Dep't of Health & Mental Hygiene*, 330 Md. 433, 436 (1993).

reimbursement rate shifts to the Medicaid rate. Medicaid provides coverage for long-term care in nursing facilities for eligible Maryland residents, and has significantly lower reimbursement rates than Medicare.

The Complaint charged that Neiswanger "strives to discharge each resident of its nursing homes at the precise point in time when the resident can be replaced by someone else with a more favorable public health insurance profile." It does this by maximizing the number of Medicare recipient residents and minimizing the number of Medicaid recipient residents. The State alleged that Neiswanger monitors residents' public health insurance statuses to identify candidates for eviction, and times that eviction to coincide with the end of the resident's Medicare coverage. It also claimed that Neiswanger unlawfully discharges Medicaid recipients to make room for more lucrative Medicare recipients in violation of HG § 19-345(b)(1)(ii).

The State alleged that in executing these practices, Neiswanger committed multiple violations of the Patient's Bill of Rights and COMAR, including failure to give required notices, in violation of HG § 19-345.1(c)(2)(i) and COMAR 10.07.09.10(D)(8). The timing of Neiswanger's discharge notices is also allegedly improper. The State claims that Neiswanger issued discharge notices before providing residents with notice of nonpayment, in violation of HG § 19-345(a)(4). Family members often learned of discharges shortly before they occurred, the day of the discharge, or not at all, in violation of COMAR 10.07.09.09(F)(4). Neiswanger allegedly fails to properly document discharges or provide residents and families with a written statement containing statutorily-required information about discharges.

4

The State also asserted that Neiswanger violates HG § 19-345.2 by failing to engage in discharge planning, develop appropriate post-discharge plans of care, or comply with other statutory procedures required before an involuntary discharge or transfer. Neiswanger allegedly does not arrange for post-discharge medical care for discharged residents, or provide a 3-day supply of current medications upon discharge. Neiswanger also violates its statutory obligation to place involuntarily discharged residents in safe and secure environments, in violation of HG § 19-345.2(c)(2).

The State also alleged that Neiswanger violates HG § 19-344(c)(5)(ii) ("C & A Clause") by failing to "cooperate with and assist" residents and their agents in applying for long-term care coverage from the medical assistance program. Specifically, Neiswanger "ignor[es] resident requests for assistance," "delay[s] the submission of required paperwork to the Department of Health and Mental Hygiene,"[6] or "impedes the submission of the long-term care applications of Medicare/Medicaid dual eligibles . . . ."

Relying on HG §§ 19-344(c)(6)(iii) ("Enforcement Clause") and 19-345.3(c) ("Injunction Clause"), Count One[7] of the State's Complaint sought an injunction to prohibit Neiswanger from: (1) further violations of HG §§ 19-344–19-345.2 and COMAR

---

[6] The Department of Health and Mental Hygiene was renamed in July 2017 to the Department of Health ("Department"). *See* HG § 1-101(c); 2017 Md. Laws ch. 214, § 1. For convenience, we refer to it as the Department, rather than DHMH.

[7] Count Two of the Complaint alleged that Neiswanger submitted false claims to Maryland's Medicaid program in violation of the Maryland False Health Claims Act. *See* HG §§ 2-601 *et seq*. Specifically, the State alleged that Neiswanger falsely sought reimbursement for discharge planning and related services that it does not provide, and falsely certified compliance with discharge-related provisions of the Patients' Bill of Rights.

5

10.07.09; (2) issuing notices of involuntary discharge for failure to pay except under specifically delineated circumstances; (3) discharging a resident who is a Medicaid participant or is Medicaid-eligible, without documenting the resident's or legal representative's failure to cooperate in applying for benefits or arranging for reimbursement; (4) discharging, for non-payment, any resident who has a pending application for Medicaid benefits, unless Neiswanger had a good faith basis for believing that the resident is ineligible for benefits; (5) discharging any resident to an unlicensed assisted living facility or incorporating such a facility into a post-discharge plan of care; and (6) discharging any resident to a homeless shelter, or incorporating such a discharge into a post-discharge plan of care, or discharging a resident without an identified discharge destination.

After the State filed its Complaint, but before Neiswanger had responded, the Department issued a Notice of Restrictions on Admissions to Neiswanger facilities, prohibiting the facilities from admitting or re-admitting residents. After a hearing, an administrative law judge recommended that the Secretary rescind the ban. On January 26, 2017, Neiswanger entered into a Consent Agreement with the Department, requiring Neiswanger to implement changes to its involuntary discharge practices, comply with the Patient's Bill of Rights, and install an independent monitor to supervise and ensure its compliance with the Consent Agreement.[8]   Neiswanger, the Department, and the

---

[8] On the same day, the State sought a temporary restraining order from the Circuit Court for Montgomery County to block Neiswanger for discharging residents for non-payment. The Circuit Court denied the State's application in an order dated March 15, 2017.

independent monitor, Dr. Daniel Haimowiz, entered into a Memorandum of Understanding (MOU) dated February 8, 2017, which expired after three months, to implement the terms of the Consent Agreement. The MOU set out specific compliance procedures for Neiswanger and outlined numerous conditions for the independent monitoring.

Neiswanger and the other defendants moved to dismiss the Complaint. After a hearing, the Circuit Court dismissed Count One of the State's Complaint for failure to state a claim upon which relief can be granted. The trial court agreed that the allegations in the State's Complaint, if true, "would certainly be in violation of the Patient's Bill of Rights . . . ." But the Circuit Court concluded that the Injunction Clause does not authorize "a broad sweeping injunction against these Defendants' company practices." It determined, based on the plain language of the statute, that the Injunction Clause authorizes injunctive relief only for an individual resident. The Circuit Court also found that the State lacked authority to sue for an injunction under the Enforcement Clause, because the statute does not specify injunctive relief as a means of enforcement for violations of § 19-344.[9]

The State filed a timely appeal pursuant to Md. Code (1973, 2013 Repl. Vol.), § 12-303(3)(iii) of the Courts and Judicial Proceedings Article, which authorizes an interlocutory appeal from a court's refusal to grant an injunction. Before the Court of Special Appeals issued a scheduling order, the State petitioned this Court for a writ of certiorari. We granted *certiorari* to answer the following questions:

---

[9] The Circuit Court also dismissed Count Two, the Maryland False Health Claims Act, for failure to state a claim upon which relief can be granted against some of the defendants. Count Two survived against Neiswanger, NMS Silver Spring, NMS Springbrook, and NMS Hagerstown.

7

1. Did the Circuit Court err in holding that, although Health–General § 19-345.3 authorizes a court to grant "injunctive relief" to remedy violations of the discharge-related provisions of the Patient's Bill of Rights, the statute excludes injunctive relief barring "company practices" that violate those provisions?

2. Did the Circuit Court err in holding that the statutory responsibility conferred on the Attorney General by Health–General § 19-344 for the "enforcement" of certain of its provisions related to the Medicaid application process does not authorize the Attorney General to seek, or a court to grant, a judicial injunction enforcing those provisions?

We answer both questions affirmatively.

**DISCUSSION**

The State appeals from the grant of a motion to dismiss a complaint for failure to state a claim upon which relief can be granted. A court considering a motion to dismiss must:

> assume the truth of, and view in a light most favorable to the non-moving party, all well-pleaded facts and allegations contained in the complaint as well as all inferences that may reasonably be drawn from them, and order dismissal only if the allegations and permissible inferences, if true, would not afford relief to the plaintiff . . . .

*RRC Ne., LLC v. BAA Maryland, Inc.*, 413 Md. 638, 643 (2010). The Circuit Court ruled that the Injunction Clause did not authorize the kind of broad injunctive relief the State sought, and that the Enforcement Clause did not authorize injunctive relief at all. Our resolution of these questions necessitates interpretation of these statutes, which is a question of law. *Davis v. Slater*, 383 Md. 599, 604 (2004). We review the Circuit Court's statutory interpretation without deference. *Id.*

8

## Justiciability—Mootness

We first address justiciability. A case is moot if, "at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy that the court can provide." *Frazier v. Castle Ford, Ltd.*, 430 Md. 144, 162–63 (2013). "An injunction should not issue if the acts sought to be enjoined have been discontinued or abandoned." *Attorney Gen. v. Anne Arundel Cty. Sch. Bus Contractors Ass'n, Inc.*, 286 Md. 324, 327 (1979). Although we do not generally offer opinions on moot questions, *City of College Park v. Cotter*, 309 Md. 573, 580 (1987), we may address moot issues under certain circumstances. *See Hammen v. Baltimore Cty. Police Dep't*, 373 Md. 440, 450–51 (2003).

Neiswanger argues that this case is moot for two reasons. First, NMS Hagerstown has closed, and Neiswanger no longer operates the other facilities. Neiswanger asserted that "the owners of NMS are out of the picture," but admitted that its "management services company" and "personnel" were involved in the transition. Second, Neiswanger maintains that the Consent Agreement and MOU contain the relief the State initially sought in its Complaint. The State disagrees. The State also contends that the best place to resolve the mootness inquiry regarding the transition in management is before the Circuit Court on remand. Further, the State argues that even if the case is moot, this Court can, and should apply either of two exceptions to mootness: (1) voluntary cessation, and (2) important issues of public interest, to decide the questions presented.

A party's voluntary cessation of conduct, or a change in the factual circumstances that formed the basis for seeking judicial relief does not require "dismissal of the judicial

9

proceedings on the grounds of mootness where the matter is a continuing controversy or the circumstances are likely to recur." *Chase v. Chase*, 287 Md. 472, 482 (1980) (Eldridge, J., dissenting). As the Supreme Court explained in *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 189 (2000), the standard for determining whether a defendant's "voluntary conduct" has mooted a case is "stringent," and subsequent events must make it "absolutely clear" that the alleged misconduct "could not reasonably be expected to recur." The party seeking to prove mootness carries a "heavy burden." *Id.*

A "reasonable expectation of recurrence" may exist when the alleged misconduct was a "continuing practice or was otherwise deliberate." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1184–85 (11th Cir. 2007). Mootness is more likely if cessation was "motivated by a defendant's genuine change of heart rather than his desire to avoid liability." *Id.* at 1186. This may be shown by the factual circumstances, particularly the relationship between the cessation and pending litigation. *Id.* (collecting cases). Refusal to acknowledge misconduct tends to support a conclusion that the cessation was motivated by a desire to evade liability, leaving a "live dispute" between the parties. *Id.* at 1187.

We may also address moot issues if we are convinced that the case contains unresolved issues of great public concern that "merit an expression of our views for the guidance of courts and litigants in the future." *Robinson v. Lee*, 317 Md. 371, 376 (1989). As we explained in *Potomac Abatement, Inc. v. Sanchez*, 424 Md. 701, 710 (2012), we will depart "'from the general rule and practice of not deciding academic questions,'" only when "'the urgency of establishing a rule of future conduct in matters of important public

10

concern is imperative and manifest . . . .'" (quoting *Lloyd v. Bd. of Supervisors*, 206 Md. 36, 43 (1954)). If the recurrence involves the "relationship between government and its citizens or a duty of government," and is likely to evade review in the future, then we may decide a question that has become moot. *La Valle v. La Valle*, 432 Md. 343, 352 (2013).

The record before the Court does not detail the transfer of management in the Neiswanger facilities. It is similarly lacking in specifics regarding implementation of the Consent Agreement and MOU, other than Neiswanger's assertion of compliance. We observe that the State sought relief beyond the terms of these documents, and that the Consent Agreement only required three months of supervision implemented under the MOU.[10] Given the paucity of the information available to us, we do not conclude that the factual circumstances make this case moot. We agree with the State that the best place to resolve this question is the Circuit Court.

Even if changed circumstances rendered the case moot, we could nonetheless address these questions under the voluntary cessation exception. The State alleged deliberate, unlawful conduct over a prolonged period of time in multiple Neiswanger facilities. Neiswanger entered into the Consent Agreement only **after** the State sued and the Department suspended all admissions, and it has never admitted any misconduct or illegality. As such, Neiswanger has not demonstrated that its allegedly wrongful behavior "could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189.

---

[10] By its own terms, the MOU expired in May 2017.

11

The Court may address the questions presented under the other mootness exception. The legislative history surrounding the enactment of these statutes, discussed *infra*, demonstrates that the Maryland General Assembly considered the issues presented in this case to be a matter of significant public policy. The Attorney General's power under the Enforcement Clause and the scope of the Injunction Clause necessarily implicate the relationship between the government of Maryland and its citizens. Further, an involuntary discharge may be completed before individual residents can seek effective relief, particularly if residents do not receive adequate notice and opportunity for a hearing before discharge as required by HG § 19-345.1. Determining the nature of the relief available and the extent of the Attorney General's enforcement powers provides important guidance for courts resolving time-sensitive issues, and will avoid duplicative and inconsistent litigation results. *See Potomac Abatement*, 424 Md. at 710–11.

With justiciability resolved, we turn to the questions presented.

## Statutory Interpretation

"The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature." *Lockshin v. Semsker*, 412 Md. 257, 274 (2010). Our analysis begins with the plain meaning of the statute. The language "must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id.* at 275–76. "If the intent of the [L]egislature is clear from the words of the statute, our inquiry normally ends and we apply the plain meaning of the statute." *Huffman v. State*, 356 Md. 622, 628 (1999). "[I]f 'the language is subject to more than one interpretation, or when the language is not clear when

it is part of a larger statutory scheme,' we try 'to resolve that ambiguity by looking to the statute's legislative history, case law, and statutory purpose, as well as the structure of the statute.'" *State v. Ray*, 429 Md. 566, 576 (2012) (quoting *Friedman v. Hannan*, 412 Md. 328, 337 (2010)). The interpretation must be reasonable, not "absurd, illogical, or incompatible with common sense." *Lockshin*, 412 Md. at 276. We begin with the Injunction Clause.

### The Injunction Clause

The Circuit Court, relying on *State Comm'n on Human Relations. v. Talbot Cty. Detention Ctr.*, 370 Md. 115 (2002), reasoned that traditional equitable factors do not apply if an injunction is statutorily authorized, and the court must be guided by the specific language of the statute. Applying this rule, the Circuit Court determined that "injunctive relief authorized is only for an individual resident, or a specified resident acting on the resident's behalf, if an involuntary discharge in violation of the law is imminent or has taken place." Thus, it reasoned, the State was not entitled to broad relief enjoining Neiswanger's "company practices" under the Injunction Clause and had failed to state a claim upon which relief could be granted. Neiswanger urges this Court to accept the Circuit Court's interpretation of the Injunction Clause—as law that not only authorizes, but cabins, relief to actions on behalf of named individuals.

To the contrary, the State sees the Injunction Clause as containing no restriction on the Attorney General's ability to act on behalf of multiple residents. In its view, when a violation of the Patient's Bill of Rights occurs, at the request of the Attorney General, a circuit court would have discretion to exercise its "full equitable authority." The State

13

avers that the Circuit Court read the Injunction Clause too narrowly, and ignored the principle that enforcement provisions of remedial statutes should be read broadly to "afford complete relief consistent with the statute's remedial purposes."

### *The Language Of The Injunction Clause*

We turn to the language of the Injunction Clause.

> A resident, resident's agent, or resident's attorney, or the Attorney General on behalf of the resident, who believes that an involuntary discharge or transfer that violates the requirements of § 19-345, § 19-345.1, or § 19-345.2 of this subtitle is imminent or has taken place may request injunctive relief from a circuit court.

HG § 19-345.3(c).

The statute accords standing to two categories of parties. The first, a "resident, resident's agent, or resident's attorney" are plaintiffs whose suits would likely redress the unlawful involuntary transfer or discharge of a specific resident. The second, and the one at issue here, is "the Attorney General, on behalf of the resident." We consider whether, by authorizing the Attorney General to take such action, the General Assembly intended for the Attorney General to act on behalf of multiple residents.[11] We are unable to find any

---

[11] Statutory standing requires determining if the statute at issue "contemplates litigants like [the State] availing [itself] of its remedies." *Suessman v. Lamone*, 383 Md. 697, 712 (2004). The Injunction Clause authorizes the Attorney General to file suit. HG § 19-345.3(c). Because the Complaint is brought under the Clause, the Attorney General has statutory standing. *See Suessman*, 383 Md. at 712. Neiswanger does not contend that the Attorney General is not a proper party to file suit. Rather, Neiswanger argues that the State lacks standing to file suit on behalf of multiple residents and that it is not entitled to the relief it seeks. The State reasons that this Court should not address standing because the Circuit Court did not rule on the issue. Neiswanger's standing argument is substantially interwoven into the interpretation of the Injunction Clause. In addressing whether the Attorney General may sue on behalf of multiple residents, and whether the violations the

14

Maryland cases that have addressed the meaning of "on behalf of" in this context. To consider whether the General Assembly intended to authorize broad or narrow enforcement of the Injunction Clause, we turn to the statutes constituting the Patient's Bill of Rights and legislative history.

## Legislative History Of The Injunction Clause

The Injunction Clause was not enacted in a vacuum. It was part of a broad statutory scheme governing involuntary discharge or transfer practices in Maryland nursing facilities that amended the Patient's Bill of Rights. *See* H.B. 343, 1995 Leg., 409th Sess. (Md. 1995). HG § 19-343(b) delineates the General Assembly's policy behind the Patient's Bill of Rights:

> (b)(1) The General Assembly intends to **promote the interests and well-being of each resident of a facility**.
> (2) It is the **policy of this State** that, in addition to any other rights, each resident of a facility has the following basic rights:
>> (i) The right to be treated with consideration, respect, and full recognition of human dignity and individuality;
>> (ii) The right to **receive treatment, care, and services that are adequate, appropriate, and in compliance with relevant State and federal laws, rules, and regulations** . . . .

(Emphasis added). This statement of intent reflects the purpose of the General Assembly to sweep broadly in according legislative protection to the vulnerable population of nursing

---

State has alleged are capable of redress under the Injunction Clause, we necessarily resolve the question of standing.

15

facilities. *See* 2A Norman J. Singer, *Sutherland's Statutory Construction* § 45.9 (7th ed. 2014) (policy section of statute stating general objectives helps court's interpretation).

In 1995, the General Assembly, at the "urging of the Attorney General . . . ." *Oak Crest Village, Inc. v. Murphy*, 379 Md. 229, 245 n.5 (2004), amended the Patient's Bill of Rights ("1995 Amendments"). The General Assembly delegated investigatory and enforcement authority to the Attorney General in several provisions of the Patient's Bill of Rights, including the Injunction Clause. HG § 19-345.2(e) authorizes the Attorney General to investigate, either upon receipt of a complaint, or under independent initiative, whether an abuse of funds under HG § 19-346[12] contributed to a decision to transfer or discharge a resident, and make referrals to other agencies.[13] The Attorney General must also enforce HG § 19-344(c)(4)–(5), relating to applications to the medical assistance program on behalf of a nursing facility resident or applicant, which we discuss in greater detail *infra*. *See* HG

---

[12] HG § 19-346(a)(2) defines "abuse of funds" as the use of a resident's assets or income:

> [a]gainst the express wish of the resident, if the expenditure was not necessary for the direct and immediate benefit and welfare of the resident; or [f]or the use or benefit of a person other than the resident if the expenditure is not also for the direct and immediate benefit of the resident or consistent with an express wish and past behavior of the resident.

*See also id.* (n). This provision may implicate nursing facilities, in addition to the usual suspects for abuse of funds, because residents are permitted to designate facility administrators to handle their funds. *See id.* (c)(2); (d)–(n).

[13] HG § 19-346(n) contemplates that a local department of social services or the Secretary of Aging may also receive complaints, and refer them to a State's Attorney for additional investigation or prosecution.

§ 19-344(c)(6)(iii); *see also Walton v. Mariner Health of Md., Inc.*, 391 Md. 643, 672 (2006).

In the 1995 Amendments, the General Assembly also made substantial alterations to existing statutes, and enacted HG §§ 19-345.1 through 19-345.3.[14] *See* 1995 Md. Laws, ch. 547, § 1. As we observed in *Walton*, 391 Md. at 671, the General Assembly passed this bill to "safeguard nursing home residents from being involuntarily discharged from a facility due to nonpayment." Proponents of 1995 Amendments sought "to assure the safety and well-being of vulnerable Marylanders facing the trauma often associated with the discharge and transfer process. . . . [because] [p]atients facing discharge may fear that they will not receive adequate care in the new location, or may face a new environment which threatens their physical or emotional well-being."[15]

The provisions most relevant to the scope of the Injunction Clause are HG §§ 19-345 through 19-345.2, which provide a comprehensive statutory scheme regulating involuntary transfers and discharges from nursing facilities. HG § 19-345(a) permits an involuntary discharge or transfer from a nursing facility only in certain circumstances:

---

[14] The Legislature also expanded the definition of neglect to include "intentional failure to provide necessary assistance and resources for the physical needs of the vulnerable adult, including food, clothing, toileting, essential medical treatment, shelter, or supervision." Md. Code (2002, 2012 Repl. Vol.), § 3-604 of the Criminal Law Article; *see also* 1995 Md. Laws, ch. 547, § 1. This statute, formerly Article 27, Crimes and Punishments § 35D, has since been modified and renumbered.

[15] Letter from Daniel R. Anderson, Director of the Medicaid Fraud Control Unit, Office of the Attorney General, to Senator Thomas L. Bromwell, Chair of the Maryland Senate Finance Committee, Regarding House Bill 343: Related Institutions—Discharge, Transfer, and Assets of Residents, at 2 (Mar. 22, 1995).

(1) The transfer or discharge is necessary for the resident's welfare and the resident's needs cannot be met in the facility;

(2) The transfer or discharge is appropriate because the resident's health has improved sufficiently so that the resident no longer needs the services provided by the facility;

(3) The health or safety of an individual in a facility is endangered;

(4) The resident has failed, after reasonable and appropriate notice to pay for, or under Medicare or Medicaid or otherwise to have paid for, a stay at the facility; or

(5) The facility ceases to operate.

These provisions are generally consistent with federal law and regulations governing involuntary discharges and transfers. *See, e.g.*, 42 U.S.C. 1396r(c)(2)(A)(i)–(vi) (2012); 42 C.F.R. § 483.15(c)(1) (2018). As amended, HG § 19-345 retained existing protections for Medicaid-eligible residents, and added new ones. *Id.* (b)(1)–(2).[16]

HG § 19-345.1(a) established new guidelines for notice and hearing requirements before a proposed involuntary discharge or transfer.[17] HG § 19-345.2 was an essential feature of the 1995 Amendments. Notes from the testimony of the Director of the Attorney General's Medicaid Fraud Control Unit refer to the implementation of specific practices

---

[16] The 1995 Amendments prohibited Medicaid-certified facilities from requiring Medicaid-eligible residents to pay as a private resident for any length of time, and retained an existing prohibition on involuntarily discharging or transferring residents because they receive Medicaid. HG § 19-345(b)(1)(i)–(ii). A facility that discharges or transfers a Medicaid-eligible resident or Medicaid recipient is presumed to be acting in violation of the law, but that presumption may be overcome if the resident was discharged for a failure to pay, and was not eligible for Medicaid. *Id.* (b)(2)(i)–(ii).

[17] Before the 1995 Amendments, HG § 19-345 required the facility to provide 30 days' written notice to the resident, and next of kin or guardian for the resident specifying the reason for the transfer or discharge, as well as afford the resident an opportunity for a hearing thereon.

before involuntary discharge as the "heart of this bill." *See Related Institutions— Discharge, Transfer and Assets of Residents: Hearing on H.B. 343 before the H. Comm. on Envtl. Matters*, 1995 Leg., 409th Sess. (Md. 1995).

HG § 19-345.2 established specific procedures to be followed before a discharge or transfer, including medical assessments, a "post-discharge plan of care for the resident," as well as written documentation from the resident's attending physician indicating that the transfer is consistent with the post-discharge plan of care, and appropriate based on the resident's medical condition. *Id.* (a)(1). Facilities must provide residents with at least a 3-day supply of medications, and certain information. *Id.* (b). A resident must consent in writing to a discharge or transfer unless it is consistent with the post-discharge plan of care, and is to a "safe and secure" environment where the resident is under the care of a licensed provider, or a person "who has agreed in writing to provide a safe and secure environment." *Id.* (c)(2).

These statutes demonstrate clear legislative intent to limit involuntary discharges and transfers, and ensure that when they do occur, they are subject to procedural controls ensuring a resident's health and safety. *See Walton*, 391 Md. at 671. Although Maryland law had some protections for residents of nursing homes before the 1995 Amendments, the new statutory scheme is more robust, and gives the Attorney General the authority to address violations of key provisions. *See* 1995 Md. Laws, ch. 547, § 1.

The 1995 Amendments are remedial because they authorized injunctive relief for residents who are facing, or have been subjected to involuntary discharge or transfer. *See Langston v. Riffe*, 359 Md. 396, 408 (2000) ("[R]emedial statutes are those which provide

19

a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries." (quoting 3 Norman J. Singer, *Sutherland's Statutory Construction* § 60.02, at 152 (5th ed. 1993))). *See also Lockett v. Blue Ocean Bristol, LLC*, 446 Md. 397, 424 (2016). But the legislative history does not explicitly state whether the General Assembly intended for the Attorney General to be able to act on behalf of multiple residents, or the breadth of relief available.

*Relevant Federal Authority*

The State asks us to consider Federal authority interpreting remedial federal statutes that permit public enforcement based on statutory violations by private individuals. In *United States v. Sch. Dist. of Ferndale, Mich.*, 577 F.2d 1339, 1343–44 (6th Cir. 1978), the Sixth Circuit considered a similar issue under the Equal Education Opportunity Act ("EEOA"), 20 U.S.C. § 1706 (2012). Section 1706 authorizes an "individual denied an equal education opportunity" to file a civil action for relief, and further provides that "[t]he Attorney General of the United States . . . for or in the name of the United States, may also institute such a civil action on behalf of such an individual."

In *Ferndale*, the district court dismissed an EEOA claim for failure to state a claim upon which relief could be granted because the complaint "did not adequately identify those persons 'on whose behalf' the action was being brought by the Attorney General." 557 F.2d at 1343–44. The district court did not require the Attorney General to actually name the individuals, but sought enough specificity to allow the court to determine whether a particular individual was within the group the Attorney General had sued on behalf of. *Id.* at 1344. The Sixth Circuit reversed, ruling that § 1706 did not require the Attorney

20

General to identify "all actual or potential victims" who had been denied an equal educational opportunity, or even specifically identify such an individual in the complaint. *Id.* at 1344–45. Provided that there was "at least one person arguably denied equal educational opportunity," the statutory requirement was met. *Id.* at 1345.

In reaching this conclusion, the Sixth Circuit emphasized that Congress had established a "broad role" for the Attorney General in "enforcing the remedial provisions of the EEOA." *Id.* at 1345 n.8.[18] The court saw "no reason to read into the statute a pleading rule not specified by Congress that can only have the effect of impeding enforcement of the Act." *Id.* at 1345. It explained that the district court's narrow interpretation of the purpose of the EEOA to protect individual rights was inconsistent with the EEOA's broader purpose of eliminating segregation-era school systems. *Id.* at 1345 n.9.

We agree with the State that, for our purposes, § 1706 of the EEOA is similar, although not identical, to the Injunction Clause.[19] Both statutes authorize an individual

_____

[18] The General Assembly's decision to give the **Attorney General** standing under the Injunction Clause is of some consequence. As we explained in *State ex rel. Attorney Gen. v. Burning Tree Club, Inc.*, 301 Md. 9, 34 (1983), "the Attorney General is first and foremost **the lawyer of the State**. . . . [whose] duties include prosecuting and defending cases on behalf of the State in order to protect and promote the State's policies, determinations, and rights." (Emphasis added).

[19] 20 U.S.C. § 1706 (2012) authorizes the Attorney General of the United States to file suit in the name of the United States on behalf of an individual. This distinction does not defeat the comparison between § 1706 and the Injunction Clause. Although the Attorney General is acting on behalf of residents under the Injunction Clause, the action is also intended to vindicate State interests and policies. As such, it is reasonable to infer that the Attorney General may sue in the name of the State.

21

cause of action, as well as public enforcement by the Attorney General. *Compare* 20 U.S.C. § 1706, *with* HG § 19-345.3(c). Further, like § 1706, the Injunction Clause establishes a standard the Attorney General must meet to seek injunctive relief—*i.e.*, an illegal involuntary discharge or transfer. *See Ferndale*, 557 F.2d at 1345. And the Injunction Clause, like § 1706, is a remedial statute. As such, we construe it "liberally in favor of claimants to 'suppress the evil and advance the remedy.'" *Wash. Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 620 (2010) (quoting *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 495 (2007)).

*Statutorily-Authorized Injunctive Relief And Judicial Equitable Discretion*

To determine whether the Injunction Clause permits the broad relief the State sought, we consider the effect of a statutory injunctive remedy on a court's equitable discretion. Both parties rely on *State Comm'n on Human Relations v. Talbot Cty. Detention Ctr.*, 370 Md. 115 (2002), but disagree about the application of this case.

The State argues that because the Injunction Clause does not contain a limitation on available relief, *Talbot County* requires a court to read that provision broadly. It reasons that once it has satisfied the statutory standard, the circuit court's equitable jurisdiction permits complete relief. Neiswanger contends that *Talbot County* restricts courts from exercising equitable discretion in statutorily-authorized injunctions, and the Injunction Clause limits the scope of the relief to redressing wrongs for an individual resident.

"An injunction is 'a writ framed according to the circumstances of the case commanding an act which the court regards as essential to justice, or restraining an act which it esteems contrary to equity and good conscience.'" *El Bey v. Moorish Sci. Temple*

22

*of America*, 362 Md. 339, 353 (2001) (quoting *Colandrea v. Wilde Lake Cmty. Ass'n, Inc.*, 361 Md. 371, 394 (2000)). To receive injunctive relief, a plaintiff must demonstrate that "it will sustain substantial and irreparable injury as a result of the alleged wrongful conduct." *Id.* at 355. Injunctions authorized by statute are, however, distinct from those issued under a court's traditional equitable powers. *See Talbot Cty.*, 370 Md. at 128–29.

In *Talbot County*, the Maryland Commission on Human Rights alleged that the Talbot County Detention Center impeded the Commission's investigation into two verified complaints of employment discrimination. *Id.* at 123. The Commission sought injunctive relief pursuant to Art. 49B § 4 of the Human Relations Commission Article, Md. Code (1957, 1998 Repl. Vol.), *repealed by* 2009 Md. Laws ch. 120, § 1, for the duration of its investigation to prohibit the Detention Center from attending confidential witness interviews, and from discouraging witnesses from participating in the Commission's investigation. *Talbot Cty.*, 370 Md. at 124. In the appeal, we considered whether the Circuit Court had subject matter jurisdiction to issue the injunction, and the propriety of its decision to deny the injunction. *Id.* at 127.

*Talbot County* was the first opportunity this Court had to address a court's discretionary authority in considering injunctions authorized by statute. *Id.* at 128. We relied on federal precedent to determine "the degree of discretionary authority a court maintains when considering injunctions sought pursuant to, and authorized by, a specific statute . . . ." *Id.* The statute is the starting point. Some statutes may limit a court's equitable jurisdiction entirely and mandate the issuance of an injunction. *Id.* (citing *Tennessee Authority v. Hill*, 437 U.S. 153, 193–95 (1978)). Other statutes may leave

23

greater discretion to a court. *Id.* at 129 (citing *United States v. Oakland Cannabis Buyers Co-op*, 532 U.S. 483, 496–97 (2001); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982)). In *Talbot County*, § 4 authorized the Commission to seek injunctive relief "[a]t any time after a complaint has been filed, if the Commission believes that appropriate civil action is necessary to preserve the status of the parties or to prevent irreparable harm from the time the complaint is filed until the time of its final disposition . . . ." *Id.* at 131 (quoting Art. 49B § 4). We explained that while § 4 did not eliminate the circuit court's discretionary authority or mandate an injunction, it "narrow[ed] the circuit court's discretionary authority by replacing the considerations in equity with the statutory criteria . . . ." *Id.* at 129–30.

We determined that § 4 granted the circuit court "unmistakable" authority and statutory jurisdiction to "issue injunctive relief at any time after a complaint has been filed with the Commission." *Id.* at 131–32. Relying on federal precedent, we explained that when the Legislature provides opportunities for a party to seek injunctive relief, it "implicitly establish[es] a standard for courts reviewing these requests . . . ." *Id.* at 137–39. Provided the Commission met the standard, the court should have granted the injunction. *Id.* at 139. The standard in § 4, we observed, was "markedly similar" to the general function of equitable relief—to prevent irreparable harm. *Id.* at 140.

In *Talbot County*, when we characterized traditional equitable factors[20] as "largely inapplicable" we spoke only to the factors relating to **a preliminary or interlocutory**

---

[20] The party seeking an interlocutory injunction must show: (1) a likelihood of success upon the merits; (2) that the injury suffered by granting the injunction is less than

**injunction**—recognizing that the injunction authorized by § 4 "**share[d] more of the characteristics of a permanent injunction**."[21] *Id.* at 136 (emphasis added). Here, the Circuit Court misread *Talbot County* when it concluded that traditional equitable factors were "largely inapplicable" in statutory injunctions. The language of the statute undoubtedly governs, but it does not invariably displace equitable factors.

*Talbot County* teaches us that a statutory injunctive remedy is not necessarily a limitation on the scope of available relief. The Legislature authorized the Commission to seek an injunction when it was necessary to carry out its purpose of investigating and enforcing the State's laws prohibiting employment discrimination. *Id.* at 142–43. Permitting the Commission to carry on its investigation without interference was consistent with the "ubiquitous nature of our State's anti-discrimination legislation" and the "indispensable nature of tools of enforcement it afforded the Commission . . . ." *Id.* at 144. Thus, the court could afford complete relief in a manner that was consistent with the purpose of the statute. *Id.* at 131.

_____

the injury that would result from refusing to grant it; (3) the plaintiff will suffer irreparable injury unless the injunction is granted; and (4) granting the injunction is in the public interest. *See Md. Comm'n on Human Relations v. Downey Commc'ns, Inc.*, 110 Md. App. 493, 516–17 (1996).

[21] The State initially sought, and was denied, a temporary injunction. The Injunction Clause does not specify whether the injunctive relief may be temporary or permanent. But the State asked the Circuit Court to enter a judgment that Neiswanger had violated the Patient's Bill of Rights, and injunctive relief. This appears to be more consistent with a permanent injunction, because it would dispose entirely of Count One. *See Colandrea v. Wilde Lake Cmty. Ass'n*, 361 Md. 371, 395 (2000) (a permanent injunction is granted after determination on merits that finally disposes on the action, not because it lasts indefinitely).

### The Scope Of Available Relief Under The Injunction Clause

*Talbot County* and *Ferndale* are our guideposts in resolving whether the Attorney General may seek injunctive relief on behalf of multiple residents, and the scope of available relief. *Talbot County* demonstrates that legislative injunctive remedies establish standards for a circuit court reviewing a request for injunctive relief. 370 Md. at 139. *Ferndale* suggests that a court interpreting a statute like the Injunction Clause that authorizes public enforcement should not construe the statute narrowly when to do so would be inconsistent with the legislative policy behind the statute. 577 F.2d at 1345.

Statutes authorizing equitable relief have been subject to an "interpretive principle that inserts a presumption into what would otherwise be the standard exercise of statutory construction: we presume that Congress, in statutorily authorizing the exercise of the district court's injunctive power 'acted cognizant of the **historic power of equity to provide complete relief in light of statutory purposes**.'" *F.T.C. v. Ross*, 743 F.3d 886, 890 (4th Cir. 2014) (quoting *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291–92 (1960)) (emphasis added); *see also* Dan B. Dobbs, *Law of Remedies* § 5.7(5), at 781 (2d ed. 1993). Once the Legislature has created a statutory equitable remedy, unless a court's inherent equitable powers are **explicitly** restricted by the statute, the court retains the power "to exercis[e] jurisdiction, to do equity and to [mold] each decree to the necessities of the particular case." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) (quoting *Hecht v. Bowles*, 321 U.S. 321, 329 (1944)).

Applying *Talbot County*, we consider that the Injunction Clause establishes a standard for a circuit court to apply in deciding whether to issue injunctive relief—the

Attorney General must have reason to believe that an involuntary discharge or transfer in violation of the Patient's Bill of Rights has taken place or is imminent. *See* HG § 19-345.3(c). This standard does not operate as a **limitation**, on available remedies, as Neiswanger suggests. Rather, it how the legislature has circumscribed the traditional showing a party must make before a court may issue an injunction. *See Talbot Cty.*, 370 Md. at 140–41; *State ex rel. Office of Attorney Gen., Bureau of Consumer Protection v. NOS Commc'ns, Inc.*, 84 P.3d 1052, 1054 & n.7 (Nev. 2004); Dobbs, *supra*, at § 2.10, at 243.

The Legislature authorized the Attorney General to seek injunctive relief to carry out its goals of preventing unlawful involuntary discharges or transfers that threaten residents' health and safety. The statutes identified in the Injunction Clause, HG §§ 19-345, 19-345.1, and 19-345.2, establish comprehensive policies and practices nursing facilities must follow when attempting to involuntarily discharge or transfer residents. Neiswanger's proposed narrow reading of the Injunction Clause is inconsistent with legislative goals and would impede enforcement of the Patient's Bill of Rights. *See Neal v. Fisher*, 312 Md. 685, 694 (1988) ("A court should not permit 'a narrow or grudging process of construction to exemplify and perpetuate the very evils to be remedied.'" (quoting *Van Beeck v. Sabine Towing Co., Inc.*, 300 U.S. 342, 350–51 (1937))); *Ferndale*, 577 F.2d at 1345. Broad relief, including the ability to act on behalf of multiple residents and to enjoin company practices that violate the Patient's Bill of Rights, is consistent with the Legislature's intent, particularly if, as the State alleges here, a facility's conduct potentially affects hundreds of residents.

27

Our analysis is consistent both with our mandate to construe remedial statutes broadly, *see Lockett*, 446 Md. at 424, and with our precedent concerning "cases in which injunctive relief directly impacts governmental interests." *Fogle v. H&G Restaurant, Inc.*, 337 Md. 441, 456 (1995). We have accepted that "in litigation between the government and a private party, the court is not bound by the strict requirements of traditional equity as developed in private litigation." *State Dep't of Health & Mental Hygiene v. Baltimore Cty.*, 281 Md. 548, 555 (1977). And "'[c]ourts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go where only private interests are involved.'" *Space Aero Prods. v. R.E. Darling Co.*, 238 Md. 93, 128 (1965), *cert. denied* 382 U.S. 843 (1965) (quoting *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937)); *see also State Dep't of Health*, 281 Md. at 555–56; *Fogle*, 337 Md. at 456–57.

Neiswanger argues that if we interpret the Injunctive Clause to permit the Attorney General to seek injunctive relief protecting multiple unnamed residents, we would override the General Assembly's delegation of authority to the Secretary of Health and the Department to regulate and enforce nursing facilities' operating conditions. Neiswanger points to the Secretary's authority to restrict new admissions to a facility for a 30-day period if "the Secretary determines that a life-threatening, health or fire safety deficiency exists in a related institution . . . ." HG § 19-328(a)(1). We are not persuaded—because a restriction on new admissions does not prohibit a facility from illegally **discharging** residents. Thus, there is no conflict between the Attorney General's authority to act on behalf of residents, and the Secretary's authority to restrict admissions.

In addition to authorizing the Attorney General to seek injunctive relief, the General Assembly also authorized the Secretary to impose civil penalties on facilities for violations of HG §§ 19-345–19-345.2. *See* HG § 19-345.3(a). There is no apparent discord between these provisions. A civil penalty against a facility affords little, if any, relief for residents who have been subjected to, or are awaiting an unlawful involuntary discharge. The General Assembly clearly intended for these provisions to operate in tandem. We are unconvinced that the Attorney General's authority to seek injunctive relief to require a facility to comply with its statutory obligations usurps the Secretary's authority under state[22] or federal regulations.[23]

---

[22] Neiswanger lists "enforcement actions" available under HG § 19-360(d)(1)(i)–(iv) that may occur "when there has been a violation of the Patient's Bill of Rights . . . ." But HG § 19-360(d) permits these enforcement actions when "the Secretary determines that a serious or life-threatening patient care deficiency exists and the hospital, residential treatment center, or health care facility fails to correct the deficiency through implementation of immediate corrective action . . . ." Further, the Secretary **must** consider a specific list of factors before determining which actions to take. *See id.* (e)(1)–(5). Injunctive relief may offer a more rapid resolution to an imminent or past unlawful involuntary discharge that is commensurate with the Legislature's goals of preventing such discharges. The Attorney General's ability to take action in that arena does not inhibit the Secretary's authority.

[23] Neiswanger cites a number of federal regulations that authorize the Centers for Medicare and Medicaid Services and the State to take action against long-term care facilities for deficiencies. In addition to terminating a provider agreement, remedies include: temporary management, denials of payment to a facility for Medicaid, or to a State for Medicare, denials of payment for all new admissions, civil monetary penalties, state monitoring, transfer of residents, closing a facility and transferring all the residents, directed in-service training, or alternative state remedies. *See* 42 C.F.R. § 488.406(a)(1)–(9) (2018). These remedies may resolve a variety of operating conditions that present a threat to resident health or safety, but they do not appear to offer the same remedy the General Assembly authorized to prevent or cure unlawful involuntary discharges.

Neiswanger suggests that the nature of the injunction sought by the Attorney General is "simply unworkable" in light of the possibility that the Secretary might amend regulations affecting nursing facilities. We are not persuaded. By that logic, courts should **never** issue injunctive relief to enforce provisions of laws because legislatures **might** change those laws, or administrative agencies **might** issue new regulations. Courts can, and do, compel performance of a variety of obligations, including compliance with law. *See, e.g.*, *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 550–51 (1937).

We hold that under HG § 19-345.3(c), the Attorney General may bring suit on behalf of multiple unnamed residents who have been subjected to, or await, imminent, unlawful involuntary discharges, provided that at least one individual's statutory rights have been violated. Further, a court may issue complete injunctive relief for violations of HG §§ 19-345, 19-345.1, and 19-345.2.

We turn to the second question presented: whether the Attorney General's authority to prosecute violations of HG § 19-344(c)(4)–(5) permits injunctive relief to enforce the requirement in the C & A Clause, that a facility "cooperate with and assist" a resident or applicant's agent in seeking assistance from the medical assistance program.

### Enforcement Of The C & A Clause

In its ruling on the State's request for injunctive relief for alleged violations of the C & A Clause, the Circuit Court explained that although the Enforcement Clause grants the Attorney General the responsibility to enforce and prosecute violations of HG § 19-344(c)(4)–(5), "the use of the word enforcement does not include injunctive relief." The Circuit Court reasoned that the General Assembly never intended to permit injunctive relief

30

because it did not specifically authorize injunctive relief either in the original 1995 enactment, or in subsequent amendments.

Neiswanger encourages us to adopt the Circuit Court's reasoning that the failure to explicitly identify injunctive relief renders it unavailable. It argues that because the General Assembly specifically authorized injunctive relief in the Injunction Clause, and did not include the C & A Clause in the statutory violations triggering an injunction, "the General Assembly's intent is clear that injunctive relief is not authorized for violations of [HG §] 19-344." Neiswanger also contends that the Attorney General's authority under the Enforcement Clause is restricted to seeking civil financial penalties against a resident's agent, and the C & A Clause is enforceable through other provisions of the Patient's Bill of Rights.

The State responds that an express grant of injunctive relief in one statute does not preempt injunctive relief to enforce other statutory provisions. Rather, injunctive relief is impliedly authorized by the term "enforcement," and the Attorney General's authority. The State reasons that because there is no other provision to ensure a facility's compliance with the C & A Clause, the Circuit Court's ruling has rendered the statute unenforceable.

The Enforcement Clause states that "[t]he Attorney General is responsible for the enforcement and prosecution of violations of the provisions of paragraphs (4) and (5) of this subsection." HG § 19-344(c)(6)(iii). The C & A Clause states that "[t]he facility shall

cooperate with and assist the agent in seeking assistance from the medical assistance program on behalf of the applicant or resident." *Id.* (c)(5)(ii).

Neiswanger is correct that paragraphs (4) and (5) are primarily devoted to the responsibilities of agents in applying for the medical assistance program. *See id.* (c)(4)– (5). But the C & A Clause is plainly set forth in mandatory terms and should not be ignored. We have consistently interpreted legislative use of the word "shall" to "indicate[] the intent that a provision is mandatory." *Dove v. State*, 415 Md. 727, 738 (2010); *Montgomery Cty. v. McDonald*, 317 Md. 466, 487 (1989) (Adkins, J. dissenting). A nursing facility's duty to cooperate with and assist a resident or applicant's agent in seeking assistance from the medical assistance program on behalf of a resident or applicant is not discretionary. *See Walton*, 391 Md. at 668 ("Section 19-344(c)(5)(i)–(ii) provides that an agent **shall** apply for medical assistance, and that **the nursing home facility must assist and advise the agent** in seeking that assistance . . . .") (emphasis added).

The General Assembly enacted the Enforcement Clause in the 1995 Amendments, discussed *supra*. The Amendments modified existing provisions of HG § 19-344(c)(4)– (5), added new ones, and expanded the statute to apply to residents of nursing facilities, as well as applicants. 1995 Md. Laws, ch. 547, § 1. The C & A Clause was enacted in 1988, *see* 1988 Md. Laws, ch. 452, § 2, and was already in HG § 19-344 at the time of the Amendments. We presume the Legislature was aware of its own laws. *See Bd. of Educ. of Garrett Cty. v. Lendo*, 295 Md. 55, 63 (1982).

But what does "enforcement" mean in the Enforcement Clause? The State and Neiswanger disagree about whether it encompasses the authority to seek injunctive relief

32

against a facility to ensure compliance with the C & A Clause. HG § 19-344(c) provides civil penalties for agents who "willfully or with gross negligence" violate the requirements of paragraphs (4) or (5). HG § 19-344(c)(6)(i)–(ii). But it does not list civil penalties for a facility's violations of the C & A Clause, or specify how the Attorney General may ensure a facility's compliance.

"Enforcement" is defined as "[t]he action or process of enforcing," as well as "[t]he forcible exaction of a payment, an action, etc.; the enforcing or compelling of (a law, demand, obligation); . . . a means of enforcing a sanction." 5 *The Oxford English Dictionary* 245 (2d ed. 1989). Courts consistently use the terms "enforce" and "enforcement" in the context of injunctive relief to require a party to comply with an obligation. For example, in *Talbot County*, 370 Md. at 144, we identified the availability of injunctive relief as a "tool[] of enforcement" the General Assembly provided the Commission. *See also, e.g.*, *Colandrea v. Wilde Lake Cmty. Ass'n*, 361 Md. 371, 395–96 (2000) (enforcing covenants that run with land may be accomplished by injunction); *Fitzpatrick v. Michael*, 177 Md. 248, 254 (1939) (referencing equity as a means of enforcement); *Bd. of Cty. Comm'rs of St. Mary's Cty. v. Potomac River Ass'n of St Mary's Cty., Inc.*, 113 Md. App. 580, 601 (1997) (enforcement mechanism of a statute leaves discretion to choose means of enforcement, including injunctions).

*Md. Ins. Comm'r v. Central Acceptance Corp.*, 424 Md. 1 (2011), is instructive on the question of whether statutory enforcement authority accorded to a government entity carries implied powers. There, we considered whether the Maryland Insurance

33

Administration had the statutory authority to issue a cease-and-desist order under the Premium Financing Title.[24] *Id.* at 14.

Central Acceptance argued that because the Commissioner had express grants of authority to issue cease-and-desist orders in other sections of the Insurance Article, the lack of the same in the Premium Financing Title, meant that the Legislature did not intend for the Commissioner to have such authority. *Id.* at 31–32. Central Acceptance relied on "the maxim of statutory construction, *expressio unius est exclusio alterius*, meaning 'to express or include one thing implies the exclusion of the other, or of the alternative.'" *Id.* at 32 (quoting *Breslin v. Powell*, 421 Md. 266, 287–88 (2011)). We rejected this argument, observing that the maxim may be easily used "to override the clear intent of the Legislature . . . ." *Id.* The statute, and particularly the General Assembly's directive to the Commissioner to enforce the Insurance Article, led us to conclude that the Commissioner's authority to issue a cease-and-desist order could be reasonably implied from the regulatory scheme in the Insurance Article. *Id.* at 34–35.

Other cases support implied statutory authority to issue injunctive relief. *See So. Ry. Co. v. Brotherhood of Locomotive Firemen & Enginemen*, 337 F.2d 127, 132–33 (D.C. Cir. 1964) (statutory command to maintain status quo pending action of administrative body sufficient to justify district court's injunction); *Shafer v. United States*, 229 F.2d 124, 128 (4th Cir. 1956) ("It is a familiar doctrine that an injunction is an appropriate means for the enforcement of an Act of Congress when it is in the public interest."). Injunctive relief

---

[24] Md. Code (1996–97, 2017 Repl. Vol.), §§ 23-301 et seq. of the Insurance Article.

is a reasonable means to ensure compliance with statutory obligations. *See Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 550 (1937) (equitable relief requiring negotiation was proper to fulfill carrier's statutory obligation).

The statutory language and the above precedent persuades us that we would undermine the General Assembly's intent if we were to conclude that the Attorney General lacks the ability to enforce the C & A Clause. The General Assembly intended to prevent involuntary discharges for nonpayment. *See Walton*, 391 Md. at 671; *see also* 1995 Md. Laws, ch. 547, § 1. As such, HG § 19-344(c)(5)(i) requires applicants, residents, or their agents to seek assistance from Medicaid. A facility's compliance is essential to that endeavor. And "[w]hether an obligation has been discharged, and whether action taken or omitted is in good faith or reasonable, are everyday subjects of inquiry by courts in framing and enforcing their decrees." *Virginian Ry.*, 300 U.S. at 550.

In *Walton*, 391 Md. at 672, we determined that a nursing facility could not pursue a private right of action against a resident's agent, because the Attorney General is specifically responsible for enforcement and prosecution of paragraphs (4) and (5) of HG § 19-344(c). Although *Walton* did not consider the extent of Attorney General's authority to enforce the C & A Clause, it suggests a broad construction of the Attorney General's authority under the Enforcement Clause. *See* 391 Md. at 672.

Given the Attorney General's exclusive power to enforce agents' obligations, *see id.*, it is only logical that the Attorney General's responsibilities also extend to enforcing a facility's obligation. The Enforcement Clause directs the Attorney General to enforce and prosecute violations of HG § 19-344(c)(4)–(5), which includes the C & A Clause. The

35

General Assembly's intent to make the facility's cooperation and assistance mandatory "is in itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief." *Virginia Ry.*, 300 U.S. at 552. The ability to seek injunctive relief necessarily follows.

Neiswanger's argument, that the Legislature foreclosed injunctive relief as a means of enforcing the C & A Clause,[25] by explicitly providing for such relief elsewhere, is substantially similar to the one we rejected in *Central Acceptance*, 424 Md. at 31–32. *Expressio unius est exclusio alterius* should never be applied to "override the manifest intention of the Legislature . . . ." *Kirkwood v. Provident Sav. Bank of Baltimore*, 205 Md. 48, 55 (1954). Neiswanger's proposed construction would render meaningless the General Assembly's decision to include the C & A Clause in the Attorney General's enforcement purview.

Neiswanger proposes that its interpretation does not leave the C & A Clause unenforceable because HG § 19-344(q) permits residents and agents to file administrative complaints about violations of HG § 19-344. Upon receipt of a complaint, the Secretary of Aging must investigate the complaint and report any findings to the complainant, and

---

[25] Neiswanger also reasons that because the Injunction Clause does not include such relief for violations of HG § 19-344, the General Assembly did not intend to permit injunctive relief for those violations.

We observe that the provisions cross-referenced in the Injunction Clause specifically address the guidelines for **discharge**. HG § 19-344 addresses **admissions requirements** and residents' rights. Although we review provisions in the context of the statutory scheme, *Lockshin v. Semsker*, 412 Md. 257, 275–76 (2010), we do not find this argument persuasive. We do not expect the General Assembly to list each provision that could merit injunctive relief.

36

the complainant must receive an opportunity for a hearing before the Department. *Id.* (q)(3)–(4). Although HG § 19-344(q) may serve as an alternate means of redressing a resident's complaints, we do not conclude that it is the sole enforcement mechanism for HG § 19-344(c)(4)–(5) in light of the General Assembly's explicit directive to the Attorney General.

We hold that HG § 19-344(c)(6)(iii) permits the Attorney General to seek injunctive relief to require a facility to comply with its statutory obligation under HG § 19-344(c)(5)(ii) to "cooperate with and assist" an agent in seeking assistance from the medical assistance program on behalf of a resident or applicant.

## CONCLUSION

Neiswanger has not met its burden of demonstrating to this Court that the case is moot. We hold that HG § 19-345.3(c) permits the Attorney General to seek injunctive relief on behalf of multiple unnamed residents who have been, or await, imminent unlawful involuntary discharges, provided the statutory standard has been met. HG § 19-345.3(c) permits a court to issue complete injunctive relief for violations of HG §§ 19-345, 19-345.1, and 19-345.2. We also hold that the Attorney General may seek injunctive relief under HG § 19-344(c)(6)(iii) to enforce a facility's obligation to "cooperate with and assist" a resident or applicant's agent in seeking assistance from the medical assistance program on behalf of a resident or applicant.

> **JUDGMENT OF THE CIRCUIT COURT OF MONTGOMERY COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

37

**COSTS IN THIS COURT TO BE PAID BY THE APPELLEE.**