*In Re: S.K.*, No. 617, Sept. Term, 2017.  Opinion by Fader, J.


**DISTRIBUTION OF CHILD PORNOGRAPHY – MD. CODE ANN., CRIMINAL LAW § 11-207(a)(4) – APPLICATION TO MINORS**

Juvenile court did not err in finding a minor involved in the distribution of child pornography under § 11-207(a)(4) of the Criminal Law Article where the minor knowingly distributed a digital video file depicting herself engaged as a subject in consensual sexual conduct.  The plain language of the statute applies to such conduct, and contains no exception where the minor depicted is also the distributor.


**CONSTITUTIONAL LAW – FIRST AMENDMENT – MD. CODE ANN., CRIMINAL LAW § 11-207(a)(4) – DISTRIBUTION OF CHILD PORNOGRAPHY BY A CONSENTING MINOR**

The First Amendment to the United States Constitution did not protect conduct of a minor who distributed a digital video file of herself engaged as a subject in consensual sexual conduct.  Section 11-207 of the Criminal Law Article proscribes only pornography involving real children, which is not protected speech under the First Amendment.


**STATUTORY CONSTRUCTION – MD CODE ANN., CRIMINAL LAW § 11-203 – DISPLAYING AN OBSCENE ITEM TO A MINOR – APPLICATION TO MINORS**

Section 11-203 of the Criminal Law Article prohibits any "person" from displaying an obscene item to a minor.  The plain meaning of "person" includes minors.


**STATUTORY CONSTRUCTION – MD CODE ANN., CRIMINAL LAW § 11-203 – DISPLAYING AN OBSCENE ITEM TO A MINOR**

The juvenile court erred in finding that a minor who distributed to other minors a digital video file depicting sexual conduct was involved in displaying an obscene item to a minor under § 11-203 of the Criminal Law Article.  The General Assembly defined "item" for purposes of the statute to include only specifically-enumerated items.  Appellant's transmission of a digital video file by text message does not fall within the definition of an "item" covered by Criminal Law § 11-203.

Circuit Court for Charles County
Case No. 08-J-17-000023

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 617

September Term, 2017

_____

IN RE: S.K.

_____

Arthur,
Fader,
Thieme, Raymond G., Jr.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Fader, J.
_____

Filed: June 5, 2017

The appellant, then-16-year-old S.K., sent a text message to two friends, both juveniles, containing an approximately one-minute-long digital video file of herself performing fellatio on a presumably-adult male. The Circuit Court for Charles County, sitting as a juvenile court, found S.K. involved in the offenses of distribution of child pornography and displaying an obscene item to a minor.[1] We affirm the juvenile court's finding on distribution of child pornography because we conclude that: (1) S.K. was a "subject" of the video; (2) the law contains no exception applicable when the juvenile is both the subject and distributor of the pornographic material; and (3) S.K.'s conduct is not protected by the First Amendment. We vacate the finding that S.K. was involved in displaying an obscene item to a minor because the statute, which expressly delineates the forms of media it covers, does not cover an electronically-transmitted digital video file.

## BACKGROUND

S.K. sent the digital file at issue to A.T., another 16-year-old girl, and K.S., a 17-year-old boy. A.T. and K.S. each received the video and viewed at least part of it. The three then-friends, who regularly exchanged "silly" videos and attempted to "outdo" one another, trusted each other to keep these group messages private. Two months later, after the three had a falling out, K.S. and A.T. reported the incident to, and shared a copy of the video with, Officer Eugene Caballero of the Charles County Sherriff's Office, their school resource officer. Officer Caballero met with S.K., who acknowledged having sent the

---

[1] A minor who is adjudicated by a juvenile court to be "involved" in offenses is not "convicted" of those offenses, nor does the minor face "any of the civil disabilities ordinarily imposed by a criminal conviction." Md. Code Ann., Cts. & Jud. Proc. § 3-8A-23(a)(1) (2013 Repl., 2017 Supp.).

video to K.S. and A.T.  S.K. expressed concern to Officer Caballero that other people had seen the video because, according to both S.K. and A.T., K.S. had by that time shared the video with other students.

The State charged S.K. with (1) filming a minor engaging in sexual conduct in violation of § 11-207(a)(2) of the Criminal Law Article (2012 Repl.), (2) distributing child pornography in violation of § 11-207(a)(4) of the Criminal Law Article, and (3) displaying an obscene item to a minor in violation of § 11-203(b)(1)(ii) of the Criminal Law Article.[2]

At the adjudicatory hearing, after taking testimony from A.T., K.S., and Officer Caballero and viewing the video, the juvenile court granted S.K.'s motion for acquittal as to the offense of filming a minor engaged in sexual conduct, but found S.K. involved in distributing child pornography and displaying an obscene item to a minor.  In a subsequent disposition hearing, the court found S.K. to be delinquent and placed her on probation with several conditions, including that she undergo a psychiatric evaluation.  S.K. appeals those findings.

**DISCUSSION**

We apply the same evidentiary standard in juvenile delinquency cases that we apply in criminal cases.  *In re Elrich S.*, 416 Md. 15, 30 (2010).  "[T]he judgment of the [trial court] will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the [trial] court to judge the credibility of the witnesses."  *Brown*

---

[2] The statement of charges incorrectly identified the relevant statutory provision as "Section 11-203(b)(ii)."  The record reflects an understanding by both parties that the correct provision is § 11-203(b)(1)(ii).  Neither party has raised any issue concerning this apparent typographical error.

*v. State*, 234 Md. App. 145, 152 (2017) (quoting *Dixon v. State*, 302 Md. 447, 450 (1985)). "When the trial court's order 'involves an interpretation and application of Maryland statutory and case law,'" we review the trial court's legal conclusions de novo. *Nesbit v. Gov't Employees Ins. Co.*, 382 Md. 65, 72 (2004) (quoting *Walter v. Gunter*, 367 Md. 386, 392 (2002)).

**I.      THE JUVENILE COURT DID NOT ERR IN FINDING S.K. INVOLVED IN THE DISTRIBUTION OF CHILD PORNOGRAPHY.**

As relevant here, § 11-207(a)(4)(i) prohibits a "person" from knowingly distributing "any matter, visual representation, or performance . . . that depicts a minor engaged as a subject in . . . sexual conduct."[3]  S.K. argues that her conduct does not fall within the prohibition of this statute both because she was not a "subject" of the video and because the provision's legislative history suggests that it was not intended to cover the distribution by a minor of material depicting his or her own consensual sexual conduct.  Based on the plain language of the statute, neither of these arguments has merit.  We also reject S.K.'s contention that her conduct is protected by the First Amendment to the United States Constitution.

**A.      The Plain Meaning of "Engaged as a Subject" in § 11-207(a)(4)(i) Requires That a Minor Must Appear in the Material at Issue.**

S.K. first contends that her conduct did not run afoul of § 11-207(a)(4)(i) because she was not "engaged as a subject" in the video.  According to S.K., "subject," in the

---

[3] "Sexual conduct" is defined as "(1) human masturbation; (2) sexual intercourse; or (3) whether alone or with another individual or animal, any touching of or contact with: (i) the genitals, buttocks, or pubic areas of an individual; or (ii) breasts of a female individual."  Md. Code Ann., Crim. Law § 11-101(d).

context of this statute, means "a minor who is unable to lawfully consent to sexual relations or who is forced to engage in sexual conduct against his or her will." Because she consented to the sexual conduct depicted, she argues, the statute is not implicated.[4] The State contends that "subject" instead means a person or thing of concern, and that S.K. was a "subject" of the video because she was featured in it. Both parties rely on dictionary definitions for support.

In resolving this question of interpretation, we apply the standard tools of statutory construction. *State v. Bey*, 452 Md. 255, 265 (2017). We ascertain legislative intent by affording "words their natural and ordinary meaning," *Davis v. State*, 426 Md. 211, 218 (2012), and "neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute," *Bey*, 452 Md. at 265 (quoting *State v. Johnson*, 415 Md. 413, 421 (2010)). In doing so, we interpret the "statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Moore v. State*, 388 Md. 446, 453 (2005).

We do not interpret statutory language in isolation, but view it "within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Bey*, 452 Md. at 266 (quoting *Johnson*, 415 Md. at 421-22). Where the legislative intent "is clear from the words of the statute, our inquiry normally ends and we apply the plain meaning of the statute." *State v. Neiswanger Mgmt.*

---

[4] A person can consent to sexual relations in Maryland generally at 16 years old. *Garnett v. State*, 332 Md. 571, 577 (1993). S.K. was thus of the age of consent to engage in the sexual conduct depicted in the video.

*Servs., LLC*, 457 Md. 441, 458-59 (2018) (quoting *Huffman v. State*, 356 Md. 622, 628 (1999)). But if a statute is ambiguous, "we consult other indicia of legislative intent, including . . . legislative history, the context of the statute within the broader legislative scheme, and the rationality of competing constructions." *In re Tyrell A*., 442 Md. 354, 362 (2015). Our "interpretation must be reasonable, not 'absurd, illogical or incompatible with common sense.'" *Neiswanger Mgmt. Servs.*, 457 Md. at 459 (quoting *Lockshin v. Semsker*, 412 Md. 257, 276 (2010)).

Applying these principles, we consider the plain language of "engaged as a subject" in the context of the entirety of § 11-207(a), which provides that "[a] person may not":

> (1) cause, induce, solicit, or knowingly allow a minor to engage as a subject in the production of obscene matter or a visual representation or performance that depicts a minor engaged as a subject in sadomasochistic abuse or sexual conduct;
>
> (2) photograph or film a minor engaging in an obscene act, sadomasochistic abuse, or sexual conduct;
>
> (3) use a computer to depict or describe a minor engaging in an obscene act, sadomasochistic abuse, or sexual conduct;
>
> (4) knowingly promote, advertise, solicit, distribute, or possess with the intent to distribute any matter, visual representation, or performance:
>
>> (i) that depicts a minor engaged as a subject in sadomasochistic abuse or sexual conduct; or
>>
>> (ii) in a manner that reflects the belief, or that is intended to cause another to believe, that the matter, visual representation, or performance depicts a minor engaged as a subject of sadomasochistic abuse or sexual conduct; or
>
> (5) use a computer to knowingly compile, enter, transmit, make, print, publish, reproduce, cause, allow, buy, sell, receive, exchange, or disseminate any notice, statement, advertisement, or minor's name, telephone number,

5

place of residence, physical characteristics, or other descriptive or identifying information for the purpose of engaging in, facilitating, encouraging, offering, or soliciting unlawful sadomasochistic abuse or sexual conduct of or with a minor.

The phrase "engage(d) as a subject" appears four times: twice in § 11-207(a)(1), and once each in § 11-207(a)(4)(i) & (ii).

Although not dispositive, dictionary definitions "provide[] a useful starting point" for statutory interpretation. *Montgomery Cty. v. Deibler*, 423 Md. 54, 67 (2011) (quotation omitted).  S.K. relies on definition (1) of "subject" from *Merriam-Webster (online)* as meaning "one that is placed under authority or control," but she fails to cite the remainder of the definition.  The full definition (1) of "subject" is:

1: one that is placed under authority or control: such as
   a : VASSAL
   b (1) : one subject to a monarch and governed by the monarch's law
      (2) : one who lives in the territory of, enjoys the protection of, and owes allegiance to a sovereign power or state

*Merriam-Webster (online)*, "subject," available at https://www.merriam-webster.com/dictionary/subject (last visited May 30, 2018).  S.K. also cites definition (1) from Black's Law Dictionary, which provides:  "Someone who owes allegiance to a sovereign, esp. a monarch, and is governed by that sovereign's laws; one who is under the governing power of another <the monarchy's subjects>."  *Black's Law Dictionary*, "subject," at 1651 (10th ed. 2014).

From these definitions, S.K. contends that "subject" in § 11-207 must mean someone who is improperly placed under the authority of another by engaging in sexual conduct either before the age of consent or, if of age, without consent.  Although creative,

6

S.K.'s argument bends the dictionary definitions she cites past the breaking point. In each of these definitions, "subject" is tied to the concept of being under the political authority of a sovereign power. Reading that meaning into § 11-207(a) would produce absurd results. It would also be inconsistent with the grammatical structure of the phrase "engaged as a subject." *See Moore*, 388 Md. at 457-60 (relying in part on an analysis of grammatical structure to identify the plain meaning interpretation of terms). A person *is* the subject of a sovereign power; she or he is not *engaged as* a subject in that sense.

The State points us to two other dictionary definitions of "subject": (1) "[t]he matter of concern over which something is created," *Black's Law Dictionary*, "subject," at 1651; and (2) "A person or thing that is being discussed, described, or dealt with," *Oxford Dictionaries (online)*, "subject," available at https://en.oxforddictionaries.com/definition/ subject (last visited May 30, 2018); *see also New Oxford American Dictionary*, "subject," at 1733 (3d ed. 2010) (same); *Merriam-Webster's Collegiate Dictionary* "subject," at 1243 (11th ed. 2014) ("something concerning which something is said or done"); *American Heritage Dictionary*, "subject," at 1735 (5th ed. 2011) ("One concerning which something is said or done; a person or thing being discussed or dealt with: a subject of gossip"). These definitions are consistent with the "ordinary and popular" usages of the term, *Deibler,* 423 Md. at 67, and, unlike the definitions proffered by S.K., do not lead to absurd results. Consistent with these definitions, a minor is "engaged as a subject" in sexual conduct if she or he is a participant in, or the object of, such conduct.

These definitions also accord with how the Supreme Court, our Court of Appeals, and this Court have discussed the government's interests in combating child pornography.

7

*See, e.g.*, *New York v. Ferber*, 458 U.S. 747, 758 (1982) (discussing the legislative judgment regarding harm from "the use of children *as subjects* of pornographic materials") (emphasis added); *Outmezguine v. State*, 335 Md. 20, 37 (1994) ("*Outmezguine II*") (discussing the State's "significant interest . . . in prohibiting the use of children *as subjects* in pornographic material") (internal citations omitted; emphasis added); *Outmezguine v. State*, 97 Md. App. 151, 159 (1993) ("*Outmezguine I*") (discussing the legislative focus "on the use of children *as the subjects* of pornographic material") (emphasis added), *aff'd*, 335 Md. 20 (1994). Based on the plain language of the statute, we therefore conclude that S.K. was "engaged as a subject in . . . sexual conduct" in the video at issue.

Although it is not necessary to consider legislative history, doing so confirms our plain language interpretation. *See Moore*, 388 Md. at 460 (using legislative history to "bolster[]" conclusion as to plain meaning). In 1978, the General Assembly created § 419A of former Article 27, the predecessor of current § 11-207, to address child pornography trafficking and curtail the sexual exploitation of minors. *See* 1978 Md. Laws, ch. 573 ("Chapter 573"); *Outmezguine I*, 97 Md. App. at 159, 162. As originally drafted, House Bill 9, which became Chapter 573, provided: "Every person who causes or knowingly permits a child under 18 years of age to engage in the production of obscene matter is subject to the penalty provided in subsection (d)." The bill was then amended to add "as a subject" after "engage," among other changes. *See* Chapter 573. The reason for the addition appears obvious: As originally drafted, the language could conceivably have been read to criminalize the use of minors in *any* aspects of production, perhaps including ordering supplies or making photocopies. Whatever one might think of the merits of such

8

a law, the focus of legislatures at that time was, as Judge Wilner subsequently identified, "on the use of children as the subjects of pornographic material," *Outmezguine I*, 97 Md. App. at 159, and not in other aspects of production.

Today's § 11-207 is a direct descendant of the original § 419A. Although the statute has been substantially revised and expanded through several rounds of revision, the use of the phrase "engaged as a subject" has carried through to the current § 11-207(a)(4)(i).[5] Legislative history thus confirms our interpretation of that language as requiring only that a minor appear as a participant in, or object of, sexual conduct or sadomasochistic abuse, not that there was an absence of lawful consent.

### B. Section 11-207(a)(4)(i) Does Not Contain an Exception for Material Depicting a Minor Who Is Legally Engaged in Consensual Sexual Activity.

S.K. next argues that legislative history demonstrates that the purpose of § 11-207(a)(4)(i) is "to criminalize the actions of child abusers, not the children who are depicted in the imagery." Thus, she contends, the law cannot be applied to individuals who, like her, were engaged in consensual sexual conduct.

Regardless of whether S.K.'s argument may have merit as a matter of policy, it has no merit as a matter of statutory construction. Section 11-207(a)(4)(i) prohibits any person

---

[5] In 1985, the General Assembly created a new § 419A(c), which criminalized distribution of child pornography even if not legally obscene. 1985 Md. Laws, ch. 494. That new provision used the phrase "engaged as a subject," presumably adopted from § 419A(a). In 1989, among other changes, § 419A(c) was then renumbered as § 419A(d). 1989 Md. Laws, ch. 398. In 2002, as part of code revision, that provision, again among other changes, was reenacted as the core of what was then § 11-207(a)(4), 2002 Md. Laws, ch. 26, and later became the current § 11-207(a)(4)(i), 2010 Md. Laws, ch. 454.

from knowingly distributing "any matter . . . that depicts a minor engaged as a subject in . . . sexual conduct." The law is not limited to non-consensual or abusive conduct and it contains no exception where the minor depicted is also the distributor. To adopt S.K.'s argument would require us to read a non-existent exemption into the statute's unambiguous text. That is not our role. *See Rodriguez v. Cooper*, \_\_\_ Md. \_\_\_, No. 27, Sept. Term, 2017, 2018 WL 1748230, at *10 (Md. Apr. 12, 2018) ("[W]e decline to insert a qualification in the statute that the Legislature did not include in the text."). S.K.'s reliance on legislative history to provide a different interpretation of § 11-207(a)(4)(i) thus fails for the simple reason that the statute is not ambiguous.

Moreover, even if we were to look beyond the statute's plain language, it does not support S.K.'s contention. Proving a legislative intent to target child abuse is a far cry from proving a legislative intent to protect child pornography that depicts consensual conduct. Indeed, S.K. does not identify *any* legislative history even suggesting such an intent. The State's interest in protecting children from sexual exploitation resulting from child pornography is broad: "The State unquestionably has a significant interest in protecting children, and in prohibiting the use of children as subjects in pornographic material." *Outmezguine II*, 335 Md. at 37 (internal citations omitted). This interest has led other courts to affirm convictions even when the conduct at issue was consensual. *See, e.g.*, *A.H. v. State*, 949 So. 2d 234, 235 (Fla. Dist. Ct. App. 2007) (affirming delinquency adjudication of a 16-year-old who digitally photographed herself and her 17-year-old boyfriend engaged in sexual behavior, even though neither shared the images with any third party).

10

The Supreme Court of Washington reached the same conclusion we reach today in *State v. Gray*, 402 P.3d 254 (Wash. 2017). There, a 17-year-old who, unsolicited, sent an image of his erect penis to an adult woman, was charged under a Washington law that prohibited "[a] person" from developing or disseminating depictions of "a minor engaged in an act of sexually explicit conduct." *Id.* at 256-57; Wash. Rev. Code. § 9.68A.050. Gray, like S.K. here, argued that the law did not apply to him. *Gray,* 402 P.3d at 256. The court disagreed, concluding that the plain language of the statute unambiguously "extends to any person who disseminates an image of any minor." *Id.* Moreover, the court observed that, had the statute been ambiguous, it would have reached the same conclusion because the legislature's interest in ending child exploitation "'extend[ed] to stamping out the vice of child pornography at all levels in the distribution chain,'" which "includes at its inception." *Id.* at 259 (quoting Wash. Rev. Code § 9.68A.001(2)).

The State has an indisputable interest in protecting minors from exploitation "as subjects in pornographic material," *Outmezguine II*, 335 Md. at 37, whether at the hands of others or by their own conduct, *Gray*, 402 P.3d at 259; *see also A.H.*, 949 So. 2d at 238 (observing that the Florida legislature had identified a "compelling interest" in ensuring that videos or pictures of "sexual conduct by a child of less than 18 years of age [are] never produced"). Indeed, S.K. was apparently so disturbed when she learned that her video was circulated more broadly than she intended that she missed significant school time. As the Supreme Court has recognized, the harm associated with child pornography does not end

11

with its production, but continues with each instance of circulation.[6] *Ferber*, 458 U.S. at

759; *see also Gray*, 402 P.3d at 259 (observing the legislative goal to "destroy the blight

of child pornography everywhere, from production of the images to commercial gain").

Unless and until the General Assembly exempts from the reach of the statute minors who

distribute materials depicting their own consensual sexual conduct, that conduct is

prohibited by the plain language of § 11-207(a)(4)(i).

---

[6] The absence of exclusions for self-produced child pornography in Maryland's law and the laws of other States is supported by the recognition among at least some commentators that a "self-produced child pornography incident" can cause significant "physiological, emotional, and mental" harm to the minor. Susan Hanley Duncan, *A Legal Response Is Necessary for Self-Produced Child Pornography: A Legislator's Checklist for Drafting the Bill*, 89 Or. L. Rev. 645, 659-60 (2010) (further observing that minors may "withdraw, do poorly in school, become depressed, and in extreme cases . . . take their lives"); *accord* Mary Graw Leary, *Sexting or Self-Produced Child Pornography? The Dialog Continues – Structured Prosecutorial Discretion Within a Multidisciplinary Response*, 17 Va. J. Soc. Pol'y & L. 486, 543 (2010) (observing that the "unique harm" of self-produced child pornography is "that it is memorialized out of the control of the child subject for eternity," often leading to "depression, anxiety, low self-esteem, and other effects from the fact that these images will be circulating forever"); *see also* Sarah E. Barr, *Child Autopornography in the Age of Snapchat—An Affirmative Defense*, 29 Geo. J. Legal Ethics 759, 759 (2016) (recognizing "that Congress intended to protect society from the broader ills of child pornography" that are "present even when . . . children who willingly produce pornographic images and videos of themselves [] act consensually"); Rayeed Ibtesam, *On Teenage 'Sexting' and the Law*, 37 Mitchell Hamline L.J. Pub. Pol'y & Prac. 246, 255 (2016) (asserting that "juvenile prosecution is a befitting response" to the harm caused by "distribution of self-exploitative images"); Jaclyn A. Machometa, *Round Up the Usual Suspexts: Advocating for Leniency on Consensual, Teenage Sext Offenders*, 14 U. Md. L.J. Race, Religion, Gender & Class 303, 316 (2014) (noting the *parens patriae* role of states in juvenile prosecutions); *see generally* Duncan, *supra* at 652-98 (discussing legislative actions to address self-produced child pornography).

### C. Minors Do Not Enjoy a First Amendment Right to Distribute Pornographic Images of Themselves.

S.K. contends that even if her conduct was prohibited by the statute, it was protected by the First Amendment. She argues that child pornography only falls outside the protection of the First Amendment if it is obscene or depicts child abuse, and that the video recording her legal and consensual act of fellatio is neither. Explaining why we disagree requires a brief exploration of the evolution of the child pornography exception to the "general rule" that pornography "can be banned only if obscene." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 240 (2002).

In *Miller v. California*, the Supreme Court established guidelines for determining when material is obscene and, therefore, falls outside the protection of the First Amendment. 413 U.S. 15, 24-26 (1973). The test is:

> (a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest, (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Id*. at 24 (internal quotation marks and citations omitted). "The *Miller* standard, like its predecessors, was an accommodation between the State's interests in protecting the 'sensibilities of unwilling recipients' from exposure to pornographic material and the dangers of censorship inherent in unabashedly content-based laws." *Ferber*, 458 U.S. at 756 (quoting *Miller*, 413 U.S. at 18-19). The joint foci of the *Miller* test are thus the impact of the materials on potential viewers and any social value the materials might have. That test is not designed to protect the subjects depicted in the material themselves.

13

In *Ferber*, the Court wrestled with whether child pornography was protected by the First Amendment unless obscene, similar to all other types of pornography, or whether it falls outside the protection of the First Amendment even if not obscene. *Id.* at 753. Mr. Ferber, the owner of an adult bookstore, was prosecuted for selling two "films . . . devoted almost exclusively to depicting young boys masturbating." *Id.* at 751-52. Although a jury found the films not to be obscene, it convicted Mr. Ferber of dissemination of child pornography. *Id.* at 752. The Supreme Court held that child pornography constitutes a separate category of speech that falls outside the protection of the First Amendment, and so upheld the conviction. *Id.* at 764. The Court identified five bases for its conclusion "that the States are entitled to greater leeway in the regulation of pornographic depictions of children" than other pornographic depictions. *Id.* at 756.

First, the Court found it "evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'" *Id.* at 756-57 (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607 (1982)). "The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance." *Ferber*, 458 U.S. at 757. The Court declined to second-guess the "legislative judgment, as well as the judgment found in the relevant literature, [ ] that the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child." *Id.* at 758. That judgment "easily passes muster under the First Amendment." *Id.*

Second, the Court observed that the distribution of child pornography and films depicting juvenile sexual activity "is intrinsically related to the sexual abuse of children,"

14

both because the materials "are a permanent record of the children's participation" in the activity and because the production of materials that harm children would not likely stop until the distribution network is closed. *Id.* at 759. Notably, the Court further observed that the State's interest in prohibiting obscenity and its interest in prohibiting child pornography are different, as the former seeks to protect the recipients of the material while the latter focuses on the harm to the children depicted. *Id.* at 760-61. For that reason, the *Miller* obscenity test is not necessarily "a satisfactory solution to the child pornography problem." *Id.* at 761.

Third, "[t]he advertising and selling of child pornography" constitute the economic incentive for its production. *Id.* To effectively address the uniformly-recognized evil of the production of child pornography, it is thus appropriate to also proscribe its advertising and sale. *Id.* at 761-62. Fourth, to the extent that there is any actual value in permitting live performances or reproductions "of children engaged in lewd sexual conduct," that value "is exceedingly modest, if not *de minimis*." *Id.* at 762. Fifth, the Court found that recognizing child pornography as an additional category of speech falling outside the protection of the First Amendment was "not incompatible" with prior First Amendment case law. Indeed, prior case law recognized that there were certain categories of speech in which "the evil to be restricted so overwhelmingly outweighs the expressive interests, if any, at stake, that no process of case-by-case adjudication is required." *Id.* at 763-64. That, the Court held, was the case for child pornography, provided the laws at issue adequately define what is prohibited. *Id.* at 764.

The Supreme Court drew further distinction between the somewhat overlapping categories of child pornography and obscenity in *Osborne v. Ohio*, recognizing that "the interests underlying child pornography prohibitions far exceed the interests justifying" laws that would prohibit obscene materials featuring adults. 495 U.S. 103, 108 (1990). "Given the importance of the State's interest in protecting the victims of child pornography," the Court thus approved of measures to "dry up the child pornography market" and "stamp out this vice at all levels in the distribution chain," not merely production and distribution. *Id.* at 110. Thus, whereas the government may not constitutionally criminalize the possession (as opposed to the production, distribution, or sale) of material that is merely obscene, it may "constitutionally proscribe the possession and viewing of child pornography." *Id.* at 111.

Almost three decades after *Ferber*, the Court addressed Congress's effort to prohibit "virtual child pornography" through a section of the Child Pornography Prevention Act of 1996 ("CPPA"). *Free Speech Coal.*, 535 U.S. at 241. In contrast to the law at issue in *Ferber*, which prohibited materials depicting actual children, the CPPA targeted sexually explicit images that only *appeared* to depict minors, including images of adults pretending to be minors and computer-generated images. *Id.* at 239-40. In cataloguing the differences between the CPPA and laws of the type approved of in *Ferber*, the Court began with the obvious: The images covered by the CPPA "do not involve, let alone harm, any children in the production process[.]" *Id.* at 241. Indeed, the Court observed, the category of speech prohibited by the CPPA was not conduct at all, but the "idea . . . of teenagers engaging in sexual activity," an idea "that is a fact of modern society and has been a theme in art and

16

literature throughout the ages." *Id.* at 246. The Court ultimately held this provision of the CPPA unconstitutional because it "covers materials beyond the categories recognized in *Ferber* and *Miller*, and the reasons the Government offers in support of limiting the freedom of speech have no justification in our precedents or in the law of the First Amendment." *Id.* at 256.[7]

Six years after *Free Speech Coalition*, the Court decided *United States v. Williams*, 553 U.S. 285 (2008). There, the Court addressed Congress's "carefully crafted" effort to address the flaws in the CPPA by enacting a new law to target those who pander or solicit what they believe to be child pornography, even if it is not. *Id.* at 307. The Court interpreted the challenged law, codified at 18 U.S.C. § 2252A, to address only "[o]ffers to engage in illegal transactions," which "are categorically excluded from First Amendment protection." *Id.* at 297. What mattered under the new law, therefore, was that the defendant believed the material to depict "*real* children." *Id.* at 303. Explaining again why child pornography involving real children is singled out for different treatment from any other pornographic material, the Court observed that it "harms and debases the most defenseless of our citizens." *Id.* at 307.

Finally, in *United States v. Stevens*, the Supreme Court addressed again its decision in *Ferber* in the course of refusing to recognize depictions of animal cruelty as a new category of speech unprotected by the First Amendment. 559 U.S. 460, 471 (2010). In

___

[7] The Court in *Free Speech Coalition* also held unconstitutional a provision of the CPPA that "criminalized the possession and distribution of material that had been pandered as child pornography, regardless of whether it actually was that." *United States v. Williams*, 553 U.S. 285, 289 (2008).

17

rejecting the notion that new categories of speech can be added to the list of those that are unprotected under the First Amendment based on "cost-benefit analysis," the Court interpreted its decision in *Ferber* as recognizing child pornography as "a previously recognized, long-established category of unprotected speech," and not as a "new" category of unprotected speech. *Id.* at 471-72; *accord United States v. Alvarez*, 567 U.S. 709, 717 (2012) (identifying "child pornography" as among the "'historic and traditional categories'" of "content-based restrictions on speech [that] have been permitted") (quoting *Stevens*, 559 U.S. at 468).

S.K.'s contention that the First Amendment protects her conduct relies heavily on certain aspects of the Supreme Court's characterization of its *Ferber* decision in *Free Speech Coalition*. In particular, S.K. emphasizes the Court's statement that *Ferber* "reaffirmed that where the speech is neither obscene nor the product of sexual abuse, it does not fall outside the protection of the First Amendment." *Free Speech Coal.*, 535 U.S. at 251. S.K. interprets that statement to offer First Amendment protection to any material depicting conduct that is not itself a crime or child abuse. Although that statement, on its own, could be read to support S.K.'s position, we think she both misreads *Free Speech Coalition* when viewed in its full context and mistakenly ignores subsequent Supreme Court precedent.

First, as support for the sentence at issue in *Free Speech Coalition*, the Supreme Court expressly relied on its statement in *Ferber* that the First Amendment still protected "[t]he distribution of descriptions or other depictions of sexual conduct, not otherwise obscene, which do not involve live performance or photographic or other visual

18

reproduction of live performances." *Id.* (quoting *Ferber*, 458 U.S. at 764-65). The distinction drawn in *Ferber*, and relied upon in *Free Speech Coalition*, was thus not between material that depicts crimes or sexual abuse and material that does not. Instead, the distinction was between material that contains a visual image of something real (i.e., a live performance or visual recording of a real event), on the one hand, and material that contains any other kind of depiction or description of real or fake sexual conduct (e.g., a story, drawing, painting, cartoon, etc.), on the other. That distinction is fully consistent with the holding in *Free Speech Coalition*, where the critical issue was whether the children depicted were both (1) real and (2) children.

Second, although the Court's decision in *Free Speech Coalition* emphasized the importance of the link between child pornography and child abuse in explaining why child pornography is not protected by the First Amendment, there is no hint in that decision that the Supreme Court intended to protect *any* pornographic material that depicts real children. To the contrary, the Supreme Court stressed in multiple places that the conduct covered by the CPPA was different from that covered by the statute at issue in *Ferber*, and thus protected by the First Amendment, precisely because the former did not involve pornographic images of real children. *See, e.g.*, 535 U.S. at 240 (stating that the "principal question to be resolved" is the constitutionality of a statute that "proscribes a significant universe of speech that is . . . no[t] child pornography under *Ferber*"); *id.* at 246 (observing that the category of "pornography produced with real children" did not "include[] the speech prohibited by the CPPA"); *id.* at 251 ("The CPPA . . . finds no support in *Ferber*.");

19

*id.* at 256 (stating that the CPPA "covers materials beyond the categor[y] recognized in *Ferber*").

Third, the Court in *Free Speech Coalition* observed in unqualified fashion that the First Amendment "does not embrace certain categories of speech, including defamation, incitement, obscenity, and pornography produced with real children." *Id.* at 245-46. Had the Court really intended to signal that "pornography produced with real children" was unprotected only if it recorded a crime or sexual abuse, it surely would have said so. Indeed, such a conclusion would have been dispositive of that case on its own. Instead, the next sentence confirmed, again without qualification, that these were all categories that "may be prohibited without violating the First Amendment." *Id.* at 246.

Fourth, when the Court returned to the subject of child pornography in *Williams*, it stated categorically that "[w]e have held that a statute which proscribes the distribution of all child pornography, even material that does not qualify as obscenity, does not on its face violate the First Amendment," 553 U.S. at 288, and that the material "held constitutionally proscribable in *Ferber*" included "any [ ] material depicting actual children engaged in sexually explicit conduct," *id*. at 293. The Court proceeded to identify the rationale of its holding in *Free Speech Coalition* as being that "the child-protection rationale for speech restriction does not apply to materials produced without children." *Id.* at 289. And in *Stevens*, the Court once again described the entire category of child pornography at issue in *Ferber* as a "long-established category of unprotected speech." 559 U.S. at 471.

In addition, criminalization of child pornography that depicts consensual conduct is still supported by most of the same reasons the Court in *Ferber* provided in concluding

"that the States are entitled to greater leeway in the regulation of pornographic depictions of children." 458 U.S. at 756. Most importantly, the State's compelling interest in "safeguarding the physical and psychological well-being of a minor," *id.* at 756-57 (quoting *Globe Newspaper*, 457 U.S. at 607), applies to all minors, not merely those below the age of legal consent. And although the underlying act itself may not, if unrecorded, constitute sexual abuse if any juvenile participants are of the age of consent, the recording of the act still becomes a "permanent record" of the participation of a child who the legislature may reasonably have determined might lack the judgment to understand the consequences of allowing the creation and distribution of that record. *Id.* at 759; *see also A.H.*, 949 So. 2d at 238 (observing that a similar Florida "statute was intended to protect minors like appellant and her co-defendant from their own lack of judgment"). Thus, even if the underlying conduct would not qualify as a separate act of sexual abuse, the distribution of the material depicting it can be exploitative and harmful. The General Assembly may also reasonably have determined that allowing the distribution of some pornography involving children—as to which there would be no practical control against broader distribution—might interfere substantially with efforts to combat the evil of child pornography more generally.

In *Ferber*, the Supreme Court recognized that the category of pornography involving real children is carved out from First Amendment protection. That holding was not disturbed by *Free Speech Coalition* or any subsequent case. *See Gray*, 402 P.3d at 346 (rejecting First Amendment overbreadth challenge to application of similar statute "[b]ecause this statute proscribes only child pornography and because child pornography

21

does not enjoy First Amendment protections"). The plain language of § 11-207(a)(4)(i) applies only to pornography involving real children. It thus does not regulate conduct protected by the First Amendment and S.K.'s as-applied constitutional challenge fails. We therefore affirm the juvenile court's finding as to distribution of child pornography.

**II.** **THE JUVENILE COURT ERRED IN FINDING S.K. INVOLVED IN DISPLAYING AN OBSCENE ITEM TO A MINOR UNDER SECTION 11-203 OF THE CRIMINAL LAW ARTICLE.**

S.K. also challenges the juvenile court's finding that she was involved in displaying an obscene item to a minor under § 11-203(b)(1)(ii) of the Criminal Law Article. In relevant part, § 11-203(b)(1)(ii) provides that "[a] person may not willfully or knowingly display or exhibit to a minor an item: . . . (ii) that consists of an obscene picture of a nude or partially nude figure." The statute defines "item" to mean a "(i) still picture or photograph; (ii) book, pocket book, pamphlet, or magazine; (iii) videodisc, videotape, video game, film, or computer disc; or (iv) recorded telephone message." Crim. Law § 11-203(a)(4). Although we reject S.K.'s contention that she is not a "person" to whom the statute applies, we hold that the digital file she sent by text message to her friends is not an "item" covered by the statute.

**A.** **S.K. Is a Person to Whom the Statute Applies.**

S.K. first argues that § 11-203 does not apply to "a minor—particularly one who is of the legal age to consent to sexual relations—sharing with peers a recording of herself engaged in a presumably lawful act." Although she makes the bald assertion that "the plain language of the statute" does not support application to a minor under these circumstances, she fails to explain why that would be so. We find this argument without merit. The plain

language of the statute prohibits any "person" from displaying an "item" "to a minor." Crim. Law § 11-203(b)(1).  For purposes of the Criminal Law Article, a minor—defined as "an individual under the age of 18 years," Crim. Law § 1-101(g)—is clearly a "person," defined to include "an individual," Crim. Law § 1-101(h).  S.K. is thus a "person" subject to the statute.

S.K. argues that the legislative history of § 11-203 demonstrates that the General Assembly intended to target only the conduct of adults.  Finding no ambiguity in the statutory text, we decline to probe whether legislative history would support a meaning contrary to the words chosen by the General Assembly.[8]  *Price v. State*, 378 Md. 378, 388 (2003) (stating that where the plain language of the statute is "clear and determinative," "we have no cause for resorting to divining legislative intent").

## B.      Section 11-203 Does Not Apply to S.K.'s Digital Video Recording.

S.K. also claims that the digital file she sent by text message does not constitute an "item" whose display is regulated by § 11-203.  The State argues that the digital file she sent was covered under the statute as a "film."  We agree with S.K.

---

[8] At oral argument, S.K.'s counsel contended that interpreting the statute to apply to minors would mean that it would prohibit a minor from viewing his or her own naked image in a mirror, which she argued would be absurd.  Because that is not the scenario presented here, we do not need to address whether that would be a reasonable interpretation of the statute, or whether we might conclude, for example, that the "person" displaying the item must be a different person from the "minor" to whom it is displayed.  In any event, there is nothing absurd about the application of the law here to preclude a 16-year-old from distributing illicit sexual images to other juveniles.

23

As with § 11-207, our task is to "ascertain and effectuate the intent of the [L]egislature" by first looking to the plain language of the statute, affording words "their natural meaning, in the manner in which they are most commonly understood." *Gillespie v. State*, 370 Md. 219, 221-22 (2002). If unambiguous, we "apply the statute as it reads" and "neither add nor delete words . . . in an attempt to extend the statute's meaning." *Id.* at 222. The State argues that we should construe the statute "liberally to effect its purpose of protecting minors from being exposed to obscene materials." However, absent a clear statement of contrary legislative intent, the rule of lenity requires that a criminal statute that is ambiguous—and as to which other standard tools of statutory construction do not clarify its legislative intent—must be read in the manner "that treats the defendant more leniently." *Bellard v. State*, 452 Md. 467, 502 (2017) (quoting *Oglesby v. State*, 441 Md. 673, 676 (2015)). Regardless, because we do not find the statute to be ambiguous, we are not free to construe it in a way that contradicts its plain meaning. We are not permitted to re-write the terms of the statute or to add language the General Assembly did not include.

The General Assembly did not leave "item" undefined. Doing so would have caused us to engage in an analysis of the General Assembly's intent in using that term, including by resort to its common and ordinary meaning. Instead, the General Assembly defined "item" for purposes of the statute to include only specifically-enumerated items. Thus, to be covered, the digital video file S.K. transmitted must be fairly included in one of the four categories of things that the General Assembly has defined as constituting an "item" for purposes of this statute. *See Gillespie*, 370 Md. at 222 (recognizing the principle of statutory construction that "the expression of one thing is the exclusion of another").

24

S.K.'s digital video file is obviously not a "still picture or photograph," "book, pocket book, pamphlet, or magazine," or "recorded telephone message," leaving only the remaining category of a "videodisc, videotape, video game, film, or computer disc." Crim. Law § 11-203(a)(4)(iii). The State argues that that the digital video file is a "film," for purposes of this statute, because a common dictionary definition of "film" is "motion picture," which the State interprets as covering any set of moving images. S.K., appearing to accept that "film" means "motion picture," argues that a one-minute digital video file is nonetheless not a "motion picture" because it is not "a movie, the type available to the public in theaters."

We interpret "film" for purposes of this statute differently from either party. "Film" has two potentially-relevant common dictionary definitions when used as a noun. The first is, in essence, film as a medium on which images or videos can be stored: "a thin flexible strip of plastic or other material coated with light-sensitive emulsion for exposure in a camera, used to produce photographs or motion pictures." *New Oxford American Dictionary*, "film," at 646; *see also Merriam-Webster's Collegiate Dictionary*, "film," at 468 ("a thin sheet of cellulose acetate or nitrocellulose coated with a radiation-sensitive emulsion for taking photographs"); *The American Heritage Dictionary*, "film," at 658 ("A thin sheet or strip of flexible material, such as a cellulose derivative or a thermoplastic resin, coated with a photosensitive emulsion and used to make photographic negatives or transparencies"); *Webster's Third New International Dictionary*, "film," at 850 (2002) ("a thin flexible transparent sheet of cellulose acetate, cellulose nitrate, or other plastic material that is used for taking photographs and that is coated with a light-sensitive emulsion which

25

when exposed and developed contains negative or positive images in black silver or in color"). The second definition is "a motion picture; a movie[.]" *New Oxford American Dictionary*, "film," at 646; *see also Merriam-Webster's Collegiate Dictionary*, "film," at 468 ("motion picture"); *The American Heritage Dictionary*, "film," at 658 ("A movie, especially one recorded on film"); *Webster's Third New International Dictionary*, "film," at 850 ("motion picture").[9]

Although each of these definitions might be viable if "film" appeared in the statute by itself, that is not the case. Instead, "film" is paired within its category with the terms "videodisc," "videotape," "video game," and "computer disc," and so we must interpret it in that context. *Bey*, 452 Md. at 266 ("We . . . do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone.") (quoting *Johnson*, 415 Md. at 421).

For two reasons, we conclude that "film," listed as part of this grouping, could only be a reference to film as a physical medium that can contain content, and not as a video itself. First, three of the four other items in the list ("videodisc," "videotape," and "computer disc") unambiguously refer only to other types of physical media, not to content that might be placed on such media. And although "video game," if it appeared

---

[9] There are other common and less specific definitions of "film," when used as a noun, that neither party cites and that we agree are inapplicable to this statute. *See, e.g.*, *Merriam-Webster's Collegiate Dictionary*, "film," at 468 ("a thin skin or membranous covering: pellicle"); *The American Heritage Dictionary*, "film," at 658 ("A thin covering or coating"); *Webster's Third New International Dictionary*, "film," at 850 ("a thin often flexible transparent sheet (as of cellophane, polyethylene, rubber, or an adhesive) used esp. as a wrapping or packaging material").

26

independently, could refer to either a type of physical media or a particular form of content, "the commonsense canon of *noscitur a sociis* . . . counsels that a word is given more precise content by the neighboring words with which it is associated." *Williams*, 553 U.S. at 294. Second, construing "film" to refer to a "motion picture," at least as broadly as the State interprets that term, would render nearly or entirely superfluous the terms "videodisc" and "videotape." When possible, we avoid any interpretation of a statute that would render any of its language superfluous. *Md. Port Admin. v. John W. Brawner Contracting Co.*, 303 Md. 44, 60 (1985). We thus conclude that the plain meaning of "film," in the context of this statute, refers to that particular type of media, on which photographs or videos can be produced.

The legislative history of § 11-203 confirms our plain language interpretation. Prior to 1995, former § 419 of Article 27 of the Maryland Code, the predecessor to § 11-203, prohibited only "engag[ing] in the business of selling, showing, advertising for sale, or distributing to a [minor] . . . any still picture, photograph, book, pocket book, pamphlet, magazine, video disc, video tape, or recorded telephone message." In 1995, the General Assembly amended the statute both (1) to include "film" and "computer disc" within the existing list of media that could not be distributed and (2) to extend the reach of the statute to the display or exhibition of the items, even if not for "business." 1995 Md. Laws, ch. 133.[10] The bill file includes numerous references indicating that both "film" and "computer

---

[10] The list was not further broken down into the current four different categories until the creation of the Criminal Law Article in 2002. 2002 Md. Laws, ch. 26.

27

disc" were understood at that time as being references to forms of media, not content. For example, the Fiscal Note for Chapter 133 observed that it "add[ed] films and computer discs *to the list of media* by which pornography may not be conveyed to minors." Md. Dep't of Fiscal Servs., Fiscal Note, S.B. 21, at 1 (1995) (emphasis added). And the Judiciary Committee's Bill Analysis included identical language, and also noted separately that the bill would "add[] film and computer discs to the *types of prohibited media*." Judiciary Comm., B. Analysis, S.B. 21, at 1 (Md. 1995) (emphasis added).[11]

The very specific list of "items" covered by § 11-203 has not kept pace with the ways in which obscene images may be displayed to minors. The last addition to that list was "video game," which the General Assembly added in 2006. 2006 Md. Laws, ch. 346. For perspective, the first iPhone was released the following year. *Apple Newsroom Press Release*, "Apple Reinvents the Phone with iPhone," Jan. 9, 2007, available at https://www.apple.com/newsroom/2007/01/09Apple-Reinvents-the-Phone-with-iPhone/ (last visited May 30, 2018). It is not within our province to expand the coverage of the statute beyond the contours of its unambiguous language.

---

[11] Other documents in the bill file demonstrate that entities supporting the bill had a similar understanding. For example, a statement in support of the bill by the Maryland State Police identified "film" and "computer disc" as "mechanisms used by adults to expose children to pornography." Md. State Police, Position on Proposed Legis., S.B. 21, at 1 (Jan. 25, 1995). And Baltimore City supported the bill "because it includes means omitted from current law, i.e., films and computer discs, in the prohibition against the displaying of pornography to minors." Memorandum from Henry W. Bogdan, Exec. Dir. of the Mayor's Office of State Relations, to Baltimore City Members of the H. Judiciary Comm., at 1 (Mar. 29, 1995) (quoting memorandum from Alvin C. Collins, Director, Baltimore City Department of Social Servs., Jan. 24, 1995).

S.K.'s transmission of a digital video file by text message from one mobile phone to two others does not fall within the definition of an "item" covered by Criminal Law § 11-203. We therefore vacate the finding that S.K. was involved in that offense.[12] We remand for reconsideration of the appropriate disposition in light of our holding.

**JUDGMENT OF THE JUVENILE COURT FOR CHARLES COUNTY AFFIRMED IN PART AND VACATED IN PART. REMANDED TO THE CIRCUIT COURT FOR CHARLES COUNTY FOR FURTHER PROCEEDINGS ON DISPOSITION. COSTS TO BE PAID BY CHARLES COUNTY.**

---

[12] S.K. also argues that the finding of her involvement under § 11-203 must be reversed because the video of her performing fellatio is not obscene as defined in the statute. Because we vacate the finding under § 11-203 on other grounds, we do not address this argument.